Ray v. Bell.

---

JESSE RAY, Plaintiff in Error, *v.* EDIE S. BELL, Defendant in Error.

### ERROR TO LA SALLE.

Great latitude is permitted on the cross-examination of a witness, and questions calculated to elicit answers which will be likely to affect the standing of the witness before the jury, should be allowed.

If a witness, in answer to a question as to what testimony he has given on a former trial, neither directly admits nor denies the act or declaration spoken of, it is then competent for the adversary to prove the affirmative, provided, however, the act or statement is relevant to the matter in issue.

The admissions of a party to a civil suit, knowing his rights, are strong evidence against him, but he is at liberty to prove that such admissions were mistaken or were untrue, unless some other person has been induced by them to alter his condition, in which case he is, as to such person, or those claiming under him, but not as to others, estopped from disputing their truth.

The fact that credits are indorsed on a note to its full amount, is not proof of its payment, unless it be shown that the credits were indorsed by the party holding and controlling the note, or by his authority.

THIS was an action of assumpsit, brought by Ray against Bell, in the Marshall Circuit Court. The declaration contained a count on a promissory note, hereinafter set out, (in evidence,) and the common counts. The defendant pleaded non-assumpsit and payment, and on these pleas issues were formed. The venue was changed to La Salle.

At February term, 1860, of the La Salle Circuit Court,

HOLLISTER, Judge, presiding, the cause was tried, and the jury rendered a verdict for defendant.

Plaintiff read in evidence a promissory note, and a memorandum on the face of it, as follows:

$2,300.                                           *Lacon, Oct.* 28, 1856.

On or before the twenty-first day of October next, I promise to pay Jesse Ray, or order, the sum of twenty-three hundred dollars, at the Banking House of Fenn, Crane & Co.                                           EDIE S. BELL.

$700 of this in St. Louis Ex. or gold.

And also read indorsements of three credits on the back of the note, as follows:

" Recd Lacon Nov 6 | 57 on the within note six hundred & fifty five dollars."

" Rec on the within five hundred & forty five 05-100 dollars."

" $407.50    Received on the within note Feb 25th 1858 four hundred & seven 50-100 dollars."

*Wm. L. Crane,* a witness for the defendant, testified: I lived in Lacon; was member of firm of Fenn, Crane & Co. We had the note for collection; got it from the plaintiff soon after it was drawn, and had it some months. It was in our hands till about the day of the last credit. The indorsement of the first two credits are in my handwriting. I do n't remember whether I received the money of those credits, or whether Ray directed me to credit them.

When I last saw the note, there was an indorsement in pencil for $700, now partially rubbed out. It was written by me or my book-keeper, late in 1857, or early in 1858; and after the first two credits were entered, and before the last credit of $407.50, now on the note. When that pencil credit was entered, about $735 was paid. It was paid in a kind of family way. Something was said between Ray and Bell about back payments. $35 was paid for exchange. The pencil entry was made a few days after. The note was in my possession in the meantime. At that time the name of our house was Wm. L. Crane & Co. Judge Ramsey was present when that $700 payment was made. The money was received for the benefit of Ray to buy a draft, and was to be a payment on the note.

On cross-examination, the witness testified: I have no recollection how the note came to our banking house. Fenn, Crane & Co. dissolved partnership in spring of 1857. At one time, just before one of the payments, this note was taken away by Ray for a short time, and then brought back; but I do n't remember whether that was at the $700 credit, entered in pencil, or not.

I have no recollection of receiving any money on the note,

except the $735. I think I had the note at that time. Ray may have brought the note in at that time, but I do n't remember.

I gave my deposition last summer, in this cause, and then swore, that some time before the $700 payment, Ray took the note away, and returned with it the day of that payment.

Witness, on further cross-examination, said: On the day of that payment, Bell brought into the bank a package of currency (received by express,) of over $1,000. Bell and Ray had talk about the payment. I did not hear it all. Bell wanted Ray to take the $700 in currency, but Ray refused. One or both of them said something to me about exchange. They wanted to know what a draft could be bought for. I said, five per cent.

One of them asked me if I could buy one at that price: I said I could, and I was paid $735 for that purpose. There was some other conversation, but I do n't now recall what it was. I do not remember that, immediately after this money was received by me, Bell paid Ray in currency the $545, which is the second credit now on the note, and that I then and there credited the same as it now appears on the note. That payment and credit may have been at that time, but I do n't remember it. I do n't remember whether it was Ray or Bell who asked me to buy the draft. Ray told me, that when the draft was bought, I should credit it on the note; that is my impression now. Something was said between Ray and Bell about specie, but I cannot remember what. I do not remember that Ray told Bell that he must have gold, or something which Moore, Morton & Co. would accept. Something of that sort was said. Ray told me, when the draft was purchased, to forward it to Moore, Morton & Co., and credit it on the note, and that is all I remember. Think Ramsey and Bell were both there at that time; it was soon after the money was paid. I can't remember who gave me the money. On the day I received the $735, I paid that money out for a draft in Peoria. I do n't remember the name of the man of whom I bought the draft. I bought it at the hotel, and had seen the man two or three times before.

I took a memorandum of his name, and of the draft, and have used it once or twice since. It is now among my papers, either in Pittsfield, where I live, or at Lacon, where I did live. I saw it last after the former trial in this cause. At that trial I was a witness for defendant. I then remembered the name of the man of whom I bought that draft; and I then refused, in giving my testimony, to give that man's name, for several reasons; one was, that there was anything but friendly feelings

between Ray and myself, and as I was not his agent, I thought he might find out his own business without my help.

This refusal to give the name of the person of whom I bought the draft, was after the court had directed me to give the name.

Here plaintiff asked witness the question : " Did the court again direct you to answer on that point, and did you refuse to answer, in disobedience to the order of the court ?" To this question defendant objected, and insisted that the contumacy of this witness on a former trial, and the merits of the controversy between witness and the then judge of the Marshall Circuit Court, could not be gone into on this trial. The court sustained said objection, and would not permit said question to be answered, and plaintiff excepted.

Witness further testified : At that time I recollected the man's name. I last saw the memorandum of name and draft in Lacon, after former trial. I never showed it to anybody. At former trial, something was said about a memorandum of the draft, but it referred to the books, in my understanding.

Plaintiff asked witness, " Did you on the former trial swear that you kept no copy or memorandum of the draft, and that you would have done so in doing a banking business ? " Witness answered, " I don't think I did."

Witness further testified : My deposition was taken in this case last summer, and I was then asked of whom I bought the draft, and refused to answer. At former trial I was ordered to jail for not answering. I was afterwards in jail, but whether for this, or for not attending as a witness, I don't know. The judge at Lacon refused to hear a petition from me, and I was afterwards taken to Peoria on *habeas corpus.*

I never did any other business with the man of whom I bought the draft, and don't know what became of him. The amount of the draft was exactly $700. Don't remember by whom the draft was drawn; but think by some Wisconsin bank. Don't remember to whose order the draft was payable on its face.

*Examined by Defendant.*—Ray afterwards asked me if I had heard anything from Moore, Morton & Co. of the receipt of the draft by them. I told him I would not hear; that he would. I advised him to write to them, which he did, and got an answer " that they had not received the draft," and telling him " to apply to me for a duplicate." I did procure a duplicate from the party of whom I got the draft, and returned it to the same party by return mail, and I think on the same day. This was shortly after Ray and I had a difficulty. We have never spoken to each other since.

The reason why I did not attend court, was because of sickness and death in my family. I returned to Lacon at that term, and was arrested. I sent in my sworn petition to be discharged, setting up these facts. The judge refused to hear it read, and fixed my bail at $500. I was afterwards taken on *habeas corpus* to Peoria, and bailed at $50.

*Cross-examined.*—It was at January term, 1859, that the judge refused to hear my petition.

Plaintiff then asked witness whether it was sickness in his family that prevented him from attending May term of Marshall Circuit Court. This question defendant objected to, that the subject of inquiry was irrelevant; the court sustained objection, and plaintiff excepted.

*D. G. Warner,* a witness for defendant, testified: Ray, in a conversation in the clerk's office in Lacon, spoke of some transactions between him and Bell, and inquired of Cook if he could not tell him how to get money out of Crane. Ray said Bell had paid the money into Crane's hands for him, and Crane claimed to have bought a draft with it, and sent it to Quincy, but Ray said he did not believe he had. I can't remember exactly what was said, but Ray expressed a fear he would lose the debt; he feared he could not get it of Bell, or something like it. The amount of $700 was mentioned, and Ray said $35 were paid to buy a draft with.

On cross-examination, witness said that this was before the date of last credit on note.

*Silas Ramsey,* a witness for plaintiff, testified: I was present in Crane's bank when the second credit ($545.05) was indorsed on this note; it was sometime in the fall of 1857, after first credit, dated Nov. 6, 1857, was made. Had before that been informed that Ray had bought land of Moore, Morton & Co., and had a payment to make to them, and that Bell was expected to pay Ray some money at the bank that day. I had occasionally done business for Moore, Morton & Co., and that day went to Crane's bank; found Ray and Crane there. Bell soon came in with a package of currency, and wanted to make a payment to Ray. A controversy arose between them about taking currency. Ray said he had a payment to make to Moore, Morton & Co., on his land, and that he must have $700 in specie; the rest he was willing to take in currency. I suggested that a draft would probably answer Moore, Morton & Co. as well as specie. Ray contended that he would receive nothing but gold. Bell then asked Crane what he would ask for a draft. Crane said he had none to sell, but that he was going to Peoria, and would agree to get him a $700 draft for $35. Bell then paid to Crane $735 in currency, and then turned to Ray, and paid

Ray v. Bell.

him in currency $500, and over. Crane then spoke of crediting the whole sum on the note, but Ray said, no, that the currency which he had received might be credited, but that the $700 must not be credited until Moore, Morton & Co. had accepted the draft. Crane thereupon credited on the note the $545 paid by Bell in person. Bell and Ray then left the office together, and the note, I think, was left in the bank. Bell made no objection to the manner of entering the credits as directed by Ray.

Plaintiff also read in evidence the deposition of Francis C. Moore, of Quincy, tending to show that no such draft as Wm. L. Crane claimed to have sent, had been received by him.

*G. L. Fort*, a witness for plaintiff, testified: I heard the testimony of witness, Wm. L. Crane, on former trial of this cause in Marshall Circuit Court.

Plaintiff then asked witness the following question: "In the testimony of said Crane upon that former trial, did he, or did he not, swear that he kept no copy or memorandum of the draft, and that he would have done so in doing a banking business, or words to that effect?" Defendant objected to this question, that the witness, Crane, in his testimony here, does not positively deny having given such testimony. The court sustained the objection, and plaintiff excepted.

At the instance of defendant, the court gave to the jury the following instructions, to the giving of each of which, plaintiff excepted:

2. If the jury believe, from the evidence, that said plaintiff Ray has, subsequent to the time of the payment of the $735 to Crane, if such payment were made, acknowledged that this was a payment of $700 to him, the plaintiff, and that the $35 was paid by Bell in the lieu of the gold, such payment ought to be allowed as a credit on the note.

3. If the jury believe, from the evidence, that the note in question is and was by its terms made payable at the banking house of "Fenn, Crane & Co.," then Bell was authorized to pay said note at said banking house, and said bankers or either of them were entitled to receive payment of the same, if, at the time of payment, if any were made, they had the legal custody of the note, and to credit the payments on said note. And if the jury further believe, that upon said note there are now indorsed credits to full amount due upon the note, they must find for the defendant.

5. If the jury believe, from the evidence, that the witness W. L. Crane, as the agent of the plaintiff, received from the defendant seven hundred and thirty-five dollars, for the purpose of buying a draft, and that it was agreed when the money was

29

paid (between the plaintiff and the defendant) that when said Crane should buy the draft he should credit seven hundred dollars upon the note, and that in receiving said money and buying the draft, said Crane acted as the authorized agent of the plaintiff, then the jury ought to allow defendant a credit on said note for seven hundred dollars.

7. It makes no difference whether the amount of the money, that is, the seven hundred dollars, or the amount of the draft, was indorsed upon the note in pencil, or whether it was indorsed at all. If the money or the draft was received by the plaintiff, or his authorized agent, as part payment of the note sued on in this cause, then the jury should allow a credit upon the note, of the amount of the draft or money so received by plaintiff.

10. If the jury believe, from the evidence, that said plaintiff accepted said sum of $735 as a payment of the sum of $700 on said note, any subsequent directions given by said plaintiff to said Crane, as to how and when such payment should be *credited* upon the note, cannot change the fact of payment, and if the credit never was made, or ordered to be made, still the payment would be good, and should be allowed upon the note.

11. If the jury believe, from the evidence, that the plaintiff inquired of Cook, in the presence of the witness Warner, if he knew of any property of Crane's out of which he could make his debt, it is a circumstance which the jury have a right to consider in determining the question whether it was Crane or Bell that owed him (Ray) this debt.

After verdict, and before judgment, plaintiff moved the court to set aside the verdict, and grant a new trial; which motion the court overruled, and plaintiff excepted.

J. St. C. Boal, and T. L. Dickey, for Plaintiff in Error.

Glover, Cook & Campbell, for Defendant in Error.

Breese, J. The ruling of the court, in sustaining the objection made by the defendant to the question put to the witness, Crane, on his cross-examination by the plaintiff, was wrong. Though it had no direct bearing on the merits of this controversy, and would have disclosed only that the witness, on a former trial of the cause, had been contumacious, yet it went to show the state of his feelings towards the plaintiff. Great latitude is allowed on a cross-examination of a witness, as it is one of the most efficacious tests for the ascertainment of truth. The refusal of the witness to give the name of the person from

whom he had purchased the draft, when ordered to do so, by the court then trying the case, in which it was an important fact, he then remembering the name, was a circumstance calculated to affect his standing before the jury, and should, for that purpose, have been allowed. This witness was also asked, if he did not, on the former trial, swear that he kept no copy of a certain letter, and no memorandum of the letter or draft, but that he would have done so, if he had been doing a banking business. The witness answered, he did not think he did—he may have said so in relation to the letter.

For the purpose of impeaching this witness, by laying this foundation, the plaintiff called G. L. Fort, who stated that he heard the former trial, and was then asked this question : " In the testimony of Crane, upon that trial, did he, or did he not, swear that he kept no copy or memorandum of the draft, and that he would have done so in doing a banking business, or words to that effect ?" The defendant objected to the question, for the reason that Crane, in his testimony on this trial, did not positively deny having given such testimony ; and the court sustained the objection. The rule on this point, as laid down by the elementary writers, and as found in reported cases, is, if the witness neither directly admits nor denies the act or declaration, as when he merely says that he does not recollect, or gives any other indirect answer, not amounting to an admission, it is competent to the adversary to prove the affirmative, for otherwise the witness might, in every such case, exclude evidence of what he had said or done, by answering, that he did not remember. 1 Starkie on Ev. 213. The statement, however, must be relevant to the matter in issue. *Crowley et al.* v. *Page*, 32 Eng. C. L. R. 737.

This matter, of which inquiry was sought, was relevant to the issue, and the court should have admitted the question.

It is objected, that the second instruction for the defendant should not have been given. That is in these words : " If the jury believe, from the evidence, that plaintiff Ray has, subsequent to the time of the payment of the $735 to Crane, if such payment were made, acknowledged that this was a payment of $700 to him, the plaintiff, and that the $35 was paid by Bell in lieu of the gold, such payment ought to be allowed as a credit on the note."

This instruction assumes that such admission is conclusive on the party. The confessions of a guilty party, in a criminal case, are competent testimony, yet they are held, everywhere, as the weakest kind of evidence, and to be weighed with the greatest caution.

Ray *v*. Bell.

The admissions or acknowledgments of a party to a civil suit, knowing his rights, are always held as strong evidence against him, but he is, notwithstanding, at liberty to prove that such admissions were mistaken, or were untrue, and he is not estopped or concluded by them, unless another person has been induced by them to alter his condition—in such a case, a party is estopped from disputing their truth, with respect to such person, and those claiming under him, but as to third parties, he is not bound by them.

Like confessions in criminal cases, verbal admissions are to be received with great caution, for the repetition of oral statements is always subject to much imperfection. The party receiving them may not have correctly understood the meaning, or the precise words used, which, given precisely as uttered, might vary the effect of the statement. But, if there be no misunderstanding—if the party making the admissions, knows his situation, and the party detailing them cannot be mistaken, such admissions are strong evidence against the party making them; for it is inconceivable that a party knowing all the facts, shall make admissions to charge himself, unless they be true. The instruction might have been qualified, so as to tell the jury, that if the plaintiff, knowing the facts, has, etc., such acknowledgment ought to be considered as an acknowledgment of payment. If a party, plaintiff, knowing the position in which he stands, and what his rights are, shall admit, distinctly and freely, and without any equivocation or reservation, that the defendant has paid the debt for which suit is brought, or some other person has done it for him at his request, there can be no rule of law or justice that shall defeat such admission.

Exception was taken to the third instruction. It is this: "If the jury believe, from the evidence, that the note in question is and was, by its terms, made payable at the banking house of 'Fenn, Crane & Co.,' then Bell was authorized to pay said note at said banking house, and said bankers, or either of them, were entitled to receive payment of the same, if, at the time of payment, if any were made, they had the legal custody of the note, and to credit the payments on said note. And if the jury further believe, that upon said note there are now indorsed credits to full amount due upon the note, they must find for the defendant."

The last clause of this instruction is clearly objectionable. The fact that credits are indorsed on the note, to the full amount of the note, is not evidence of the payment of the note, unless it be shown the credits were indorsed by the party holding and controlling the note, or by his authority. The credits

may have been surreptitiously placed upon the note, by one without authority.

We can discover no valid objection to the fifth instruction, which is as follows: "If the jury believe, from the evidence, that the witness, W. L. Crane, as the agent of the plaintiff, received from the defendant seven hundred and thirty-five dollars, for the purpose of buying a draft, and that it was agreed when the money was paid, (between the plaintiff and the defendant), that when said Crane should buy the draft, he should credit seven hundred dollars upon the note, and that in receiving said money and buying the draft, said Crane acted as the authorized agent of the plaintiff, then the jury ought to allow defendant a credit on said note for seven hundred dollars."

The testimony fully justified this application to the court. If the facts supposed were found by the jury to be true, it ends the controversy, whether Crane bought the draft or not. If the currency was paid to him, at the request of Ray, for the purpose of buying a draft, he is responsible to Ray, and Bell is released. The whole controversy turns upon that, and it was fairly put to the jury.

The seventh instruction is a proper corollary from the fifth, and is free from the objections alleged against it. It is as follows: "It makes no difference whether the amount of the money, that is, the seven hundred dollars, or the amount of the draft, was indorsed upon the note in pencil, or whether it was indorsed at all. If the money or the draft was received by the plaintiff, or his authorized agent, as part payment of the note sued on in this cause, then the jury should allow a credit upon the note of the amount of the draft or money so received by plaintiff."

Nor do we see any valid objections to the remaining instructions, to which exceptions were taken, marked ten and eleven. They are as follows:

"If the jury believe, from the evidence, that said plaintiff accepted said sum of $735 as a payment of the sum of $700 .on said note, any subsequent directions given by said plaintiff to said Crane, as to how and when such payment should be *credited* upon the note, cannot change the fact of payment, and if the credit never was made, or ordered to be made, still the payment would be good, and should be allowed upon the note.

"If the jury believe, from the evidence, that the plaintiff inquired of Cook, in the presence of the witness, Warner, if he knew of any property of Crane's out of which he could make his debt, it is a circumstance which the jury have a right to consider in determining the question, whether it was Crane or Bell that owed him (Ray) this debt."

There was evidence to support both these instructions.

Ray v. Bell.

For the errors we have noticed, we would not deem it proper, or in accord with former rulings of this court, to reverse the judgment, inasmuch as the case was fully submitted to the jury on its merits, and no substantial misdirection of the court, on any important point, is observable.

There is still, however, an error in the finding of the jury, which we cannot get over, and that is, they have found a verdict for the defendant, when the proofs show that there is an actual balance due the plaintiff, for which he must have judgment.

The amount of the note sued on, is twenty-three hundred dollars, dated Oct. 28, 1856, and payable on or before the 21st October next, without interest. Interest, then, is to be calculated from the 21st Oct., 1857, to the time of the first payment of $655 indorsed on the note, which was Nov. 6th, 1857, and amounts to six $\frac{10}{100}$ dollars, increasing thereby the principal sum to $2,306.10. Deducting this payment, there is left, of principal, $1,651.10. The second payment bears no date, but Ramsey says it was made when the $700 was handed to Crane by Bell, which he says was late in 1857, or early in 1858. We assume it was paid on the last day of Dec., 1857, which would be one month and twenty-five days; the interest for that time on $1,651.10 would be fifteen dollars and thirteen cents, making the sum then due, $1,666.23. Allowing the $700 then alleged to be paid, with the undated credit of $545.05, the sum of $1,245.05 was then paid, which deducted, there remained due, $421.18. Interest on this sum to Feb. 25, 1858, when the last payment of $407.50 was made, would be $3.79, increasing the principal to $424.97; deducting the payment then made, $407.50, left due on the note, $17.47, to which is to be added interest to the time of the verdict, which was March 3rd, 1860, two years and seven days, making $2.10, showing a real balance due on the note, of nineteen $\frac{57}{100}$ dollars, for which the plaintiff should have had a verdict.

For this error the judgment must be reversed, as we cannot correct it here, and the cause remanded.

*Judgment reversed.*