THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
FRANK PURRAZZO, Defendant-Appellant.

First District (2nd Division)    No. 80-101

Opinion filed April 7, 1981.—Rehearing denied May 12, 1981.

Jerome Rotenberg, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Richard F. Burke, and Barry A. Gross, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Defendant, Frank Purrazzo, was charged in an information with murder and armed violence. (Ill. Rev. Stat. 1977, ch. 38, pars. (9—1(a), 33A—2.) Following a jury trial defendant was found guilty of both offenses and was sentenced to serve two concurrent terms of 20 years in

the Department of Corrections. From those judgments defendant has appealed, presenting the following issues for review: (1) whether the trial court erred in refusing to instruct the jury on the issues of voluntary manslaughter and justified use of force; (2) whether the State's cross-examination of defendant was improper and prejudicial; (3) whether the State improperly argued facts not based upon the evidence to the jury; and (4) whether the State improperly attempted to impeach defendant through the use of his post-arrest silence. For the reasons hereinafter set forth, we affirm the judgments finding defendant guilty of murder and armed violence.

Defendant's common-law wife, Esperansa Delarosa, was shot to death on the evening of December 1, 1978. At approximately 10:30 p.m. on that evening Chicago police officers Thomas Czapiewski and Jerritt Yedlinski received a radio report of a woman shot at an apartment building located at 4415 North Lawndale. After the officers arrived, they entered the vestibule of the building and started to ring the doorbells. Czapiewski knocked at the door to the garden apartment. Defendant opened the door, Czapiewski identified himself as a police officer and asked, "What happened?" Defendant answered, "I just shot my wife." The officers entered the apartment and saw a woman, later identified as Esperansa Delarosa, sitting in a pool of blood on the couch in the living room. Talia Purrazzo, the 3½-year-old daughter of the victim and defendant, was also present. Officer Yedlinski immediately checked the woman's vital signs but could not detect a heartbeat. There was blood on her clothes and on the wall behind her as well as what appeared to be two bullet holes in the same wall. Yedlinski observed bullet wounds to the woman's upper thigh and torso.

Officer Czapiewski found a handgun on the floor in the living room a few feet from the couch. He also discovered two spent shells, one on a chair in the living room and one on the floor. Neither officer saw any marks, bruises or bloodstains on defendant.

Area 5 Homicide Investigator Michael Miller arrived at the apartment at about 11:30 p.m. He noticed the weapon on the floor approximately six feet from the couch. After the evidence technicians had processed the weapon, Miller inspected it and identified it as a Browning .380 semi-automatic pistol, which still contained two live rounds. He testified that a separate pull of the trigger would be necessary to fire each shot from the weapon. While he was at the scene Miller saw blood on the sofa underneath the victim by her right thigh, on the rear of the sofa behind her head and on the wall behind. There was no other blood in the apartment.

Miller recovered three expended cases in the apartment, one from a

chair in the living room and two from the floor next to the sofa. The cases would have been ejected from the right side of the weapon as it was being fired. Miller also found some clothing and a broken wine glass on the floor of the kitchen.

Dr. Eupil Choi performed the autopsy on the body of the victim on December 2, 1978. In the course of his examination Dr. Choi observed entrance wounds to the right side of the head, the abdomen and the right side of the groin, and one exit wound on the left side of the head. Only the bullets fired into the victim's abdomen and groin were recovered. The abdominal entrance wound was approximately two inches above the navel. The bullet traveled in a "backward and mildly downward direction," pierced her intestines and came to rest in her lower back on the left side. The bullet that entered the right side of her groin proceeded in a "mildly leftward and backward and upward direction" and lodged beneath the pelvic floor. The course of the bullet that passed through the victim's head was straight but "sharply leftward."

In Dr. Choi's opinion the victim died from bullet wounds to her head, abdomen and groin which penetrated her brain and intestines. He could not determine whether she was sitting or standing when she was shot. There were no contact wounds and the pathologist saw no signs of "strippling," *i.e.*, powder burns which would have been evident had the pistol been fired at the victim within arm's length, approximately 12 inches.

Defendant took the stand in his own defense and testified that as of December 1, 1978, he had been living with the victim for five years and that she had given birth to his daughter, Talia. Defendant arrived home about 6:30 p.m. that evening. The victim, their baby daughter and their German Shepherd dog were present. Defendant and the victim went to the corner tavern and each consumed three small beers. Defendant walked back to the apartment by himself to prepare dinner.

Defendant said that when the victim came home 45 minutes later she was drunk. As they sat down to eat, the victim started arguing with defendant and pitched her paper plate onto the floor. When defendant asked her why she did that, the victim threw a wine glass at him which missed defendant and hit the china closet behind him. She started pushing him around in the kitchen, and defendant ran and hid in the bathroom for a few minutes. After he came out, the victim rushed out of the kitchen to defendant and told him that he would never see daylight again. She then proceeded into the living room. Defendant picked up the baby and followed her into that room. According to defendant, the victim then approached him and pointed his gun at him. Worried about the baby who was still in his arms, and fearing that his life was in danger, defendant tried to disarm the victim. While he was struggling with her, the gun

discharged accidentally and defendant pushed her onto the couch. The dog jumped at defendant, and the gun kept "going off." Defendant "dropped everything" and called the police.

Defendant testified that he did not intentionally shoot and kill the victim and denied that he intended to cause her death or great bodily harm.

On cross-examination defendant could not recall how many times he fired the gun. He did not believe that the first shot hit the victim. After the first shot he had the gun in his own hands. Defendant explained: "I had the gun, took it from her, dog jump on me like as he was jumping, thing went off, and I went goofy." The dog would not "bite us but he thought we hurt the baby." Defendant stated that he explained to the police the circumstances of what had happened. He told them that the victim had argued with him and threw a wine glass at him, and that he had acted in self-defense. Defendant, however, never informed the police that the gun discharged accidentally because the dog had been jumping on his arm. He assumed that they knew.

Defendant did not recall telling the police that he was "deathly afraid" of the victim or that she had called the police and requested that a unit be sent to their apartment. Defendant denied informing the police that his wife attempted to remove the gun from the dresser. He also denied saying to the police that the gun had come from the dresser drawer, that he had the gun and was angry with the victim and shot her.

The State and defendant stipulated that a toxicologist found evidence of 113 milligrams of alcohol in the victim's blood. They also stipulated that the victim called the police at 10:23 p.m. on the evening of the shooting.

In rebuttal the State recalled Investigator Miller who testified that he interviewed defendant at Area 5 Homicide about 1 a.m., December 2, 1978. Defendant was nervous, upset and crying. He was advised of his *Miranda* rights and said that he wanted to make a statement regarding the shooting of the victim. Defendant told the investigator that he had argued with his wife in the evening and that during the course of their argument his wife called the police and requested that a unit be sent to his apartment. According to Miller, defendant also stated that after the victim called the police she threw a wine glass at him. The argument went from the kitchen into the living room where there was a dresser. Defendant said his wife had gone to the dresser and attempted to take a gun out of it. He wrestled with his wife to obtain control of the gun and then shot her.

At the conclusion of Investigator Miller's testimony, both sides rested. The trial court refused defendant's proferred instructions on voluntary manslaughter and justified use of force because in the court's judgment defendant's theory at trial was that the shooting was an accident. The jury

returned verdicts finding defendant guilty of murder and armed violence. The trial court sentenced defendant to serve 20 years in the Department of Corrections on each charge, the sentences to run concurrently.

## I.

Defendant's first argument on appeal is that the trial court erred in refusing to instruct the jury on the lesser included offense of voluntary manslaughter and on the use of justified force. The People respond that the jury was properly instructed.

Section 9—2 of the Criminal Code of 1961 states in pertinent part:

"(a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed, * * *.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code [Ill. Rev. Stat. 1977, ch. 38, pars. 7—1 through 7—14], but his belief is unreasonable." Ill. Rev. Stat. 1977, ch. 38, par. 9—2.

Section 7—1 states:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself * * *." Ill. Rev. Stat. 1977, ch. 38, par. 7—1.

■■ Defendant contends that he presented evidence which required the trial court to submit to the jury his instructions setting forth the elements of the offense of voluntary manslaughter under both sections (a) and (b) of the statute. Defendant contends further that the jury should have been instructed in the defense of justifiable use of force. We cannot agree with either contention.

It is the settled rule in murder cases that if there is evidence in the record which, if believed by a jury would reduce the crime to manslaughter, a manslaughter instruction tendered by the defendant must be given. (*People v. Simpson* (1978), 74 Ill. 2d 497, 500, 384 N.E.2d 373;

*People v. Lockett* (1980), 82 Ill. 2d 546, 550, 413 N.E.2d 378.) It is equally well settled, however, that such an instruction should not be given if the evidence clearly demonstrates that the crime was murder or nothing and there is no evidence to support a conviction of manslaughter. *Simpson*, at 501; *Lockett*, at 551; *People v. Craven* (1973), 54 Ill. 2d 419, 425, 299 N.E.2d 1.

Defendant also claims that his instruction on justifiable use of force should have been given. The supreme court has repeatedly held that "[a] defendant is entitled to the benefit of any defense shown by the entire evidence, even if the facts on which such defense is based are inconsistent with the defendant's own testimony" (*People v. Scalisi* (1926), 324 Ill. 131, 145, 154 N.E. 715; *People v. Papas* (1942), 381 Ill. 90, 96, 44 N.E.2d 896; *People v. Izzo* (1958), 14 Ill. 2d 203, 211, 151 N.E.2d 329) and that "very slight evidence upon a given theory of a case will justify the giving of an instruction." (*People v. Khamis* (1951), 411 Ill. 46, 53, 103 N.E.2d 133; *People v. Kalpak* (1957), 10 Ill. 2d 411, 425, 140 N.E.2d 726.) Nevertheless, the "very slight evidence" test does establish a minimal level beneath which instructions need not be given. "To hold otherwise would permit a defendant to demand unlimited instructions, which are wholly unrelated to the case but are based upon the merest factual reference or witness' comment." (*People v. Bratcher* (1976), 63 Ill. 2d 534, 540-41, 349 N.E.2d 31.) With these considerations in mind we turn to a review of the evidence which defendant cites in support of his argument that the jury should have been instructed on voluntary manslaughter and justified use of force.

■■ Defendant testified that before the victim was shot, she argued with defendant, threw a wine glass at him, pushed him around in the kitchen, told defendant that he would never see daylight again and pointed a gun at him. Defendant testified further that when the victim pointed the gun at him he was in fear for his life. A voluntary manslaughter instruction under section 9—2(a) is appropriate and must be given if tendered by the defendant where there is some evidence of "conduct sufficient to excite an intense passion in a reasonable person." Such conduct includes "substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse, * * *." (Ill. Ann. Stat., ch. 38, par. 9—2, Committee Comments, at 393 (Smith-Hurd 1979); *People v. Crews* (1967), 38 Ill. 2d 331, 335, 237 N.E.2d 231.) A voluntary manslaughter instruction under 9—2(b) and a self-defense instruction under section 7—1 must be submitted where there is some evidence in the record which, if believed by a jury, would support a claim of self-defense. (*People v. Lockett* (1980), 82 Ill. 2d 546, 551-53, 413 N.E.2d 378.) Defendant, however, presented no evidence that the shooting itself was the result of serious provocation or in the belief that he was acting in self-defense.

Defendant testified that the weapon discharged accidentally as he

was trying to wrest control of it from his wife. After the first shot had been fired, defendant pushed the victim onto the living room couch. According to defendant his German Shepherd dog then jumped on his arm, making the gun fire several more times. Defendant's theory at trial was that the killing was inadvertent and unintentional. Defendant correctly states that where there is evidence in the record which, if believed by the jury, would reduce the crime to a lesser included offense, an instruction defining that offense should be given even though the theory of defense at trial is inconsistent with the possibility that the defendant is guilty of the lesser offense. (See *People v. Bembroy* (1972), 4 Ill. App. 3d 522, 525, 281 N.E.2d 389.) A defendant may rely on the totality of the evidence which appears in the record, regardless of its source. (*People v. Simpson* (1978), 57 Ill. App. 3d 442, 446, 373 N.E.2d 809.) In the case at bar, however, defendant does not claim nor do we find that any of the evidence introduced by the State would support an instruction on voluntary manslaughter or justified use of force.

■■ Defendant's account at trial of the various incidents of provocation and threats which preceded the killing of the victim provides no basis for an instruction on voluntary manslaughter or self-defense where defendant testified that the shooting itself was accidental. The defense of accident is not compatible with the "sudden and intense passion resulting from serious provocation" necessary under subsection 9—2(a) of the statute defining voluntary manslaughter. In reference to that subsection, our supreme court has observed that "[t]he offense of voluntary manslaughter has commonly been described as '[a]n intentional homicide committed in a sudden rage of passion engendered by adequate provocation, and not the result of malice conceived before the provocation * * *' (Perkins, *The Law of Homicide*, 36 J. Crim. L. & Criminology 391, 412 (1946).)" (*People v. Leonard* (1980), 83 Ill. 2d 411, 420.) And subsection 9—2(b) of the statute applies to one who *intentionally* or *knowingly* kills another under an unreasonable belief that the killing is necessary in order to defend himself. If the belief is reasonable, then the defendant is exonerated from any criminal liability under the justifiable-use-of-force provisions of section 7—1 of the Criminal Code. It follows, therefore, that an instruction on voluntary manslaughter or justifiable use of force cannot be based solely upon the defendant's testimony where the defendant himself states that the killing was accidental.

By its very nature self-defense, whether reasonable or not, relates to the intentional or knowing use of force and not to an accidental shooting. If defendant acted in what he believed to be self-defense, he must have fired the weapon intentionally or knowingly. If the gun was accidentally discharged, all questions of self-defense are out of the case. *People v. Dzambazovic* (1978), 61 Ill. App. 3d 703, 717, 377 N.E.2d 1077.

*Dzambazovic* presents facts which, in some respects, are strikingly similar to those related by defendant. In that case the defendant testified that his girlfriend became hysterical during an argument while they were in his automobile. She pulled a gun from the glove compartment and threatened to shoot both the defendant and herself if he persisted in his intention to drive to the home of her new boyfriend. The defendant grabbed for the gun and a struggle ensued during which the woman was shot and killed. The court, as previously noted, held that the defendant's self-defense instruction was properly refused where his testimony, if believed, would indicate that the killing was accidental.

In *People v. Tanthorey* (1949), 404 Ill. 520, 530, 89 N.E.2d 403, cited in *Dzambazovic*, the supreme court stated that instructions on self-defense were correctly refused where the defendant testified that the killing was an accident, that he was not aware that he had fired the weapon or that he had shot the victim, and that it was not his intention or purpose to shoot him. The court, at page 531 of its opinion, also held that "the defense of misadventure advanced by him in his testimony cannot be reconciled with the offense of manslaughter any more than it can be reconciled with the offense of murder. The two are incompatible and cannot emerge from one factual situation." As in *Tanthorey*, the defendant's testimony "contains no facts, assuming it to be true, upon which the giving of a manslaughter instruction could be rightfully predicated." *Tanthorey*, at 531.

Defendant, however, calls our attention to the Second District's opinion in *People v. Boothe* (1972), 7 Ill. App. 3d 401, 287 N.E.2d 289. In *Boothe* the defendant testified that the victim came after him with a knife. During the ensuing struggle, the victim slipped and impaled herself on the knife. Evidence was also presented that the victim had been involved in other incidents with knives and that this was known to the defendant. The court held that the defendant's testimony that he was attacked by the victim with a knife while they were fighting was sufficient to require the trial court to submit defendant's tendered instruction on voluntary manslaughter: "The fact that defendant relied on the defense of accidental death does not preclude him from raising the issue since he is entitled to the benefit of any defense based on the evidence even if inconsistent with his own testimony." *Boothe*, at 403.

Somewhat similar language appears in the Fourth District's recent opinion in *People v. Buchanan* (1980), 91 Ill. App. 3d 13, 414 N.E.2d 262. There the trial court instructed the jury on voluntary manslaughter and self-defense but refused to allow the defendant to introduce evidence of the deceased's violent character. The defendant appealed arguing that such evidence should have been admitted. The appellate court agreed in spite of the defendant's testimony that "the shooting occurred during and

as a result of the struggle and was in that sense accidental." (*Buchanan*, at 15.) The conviction was affirmed, however, where other evidence was introduced which brought to the attention of the jury the deceased's violent reputation.

■■ *Boothe* and *Buchanan* seem to suggest that a voluntary manslaughter instruction must be given to the jury in any case where the defendant claims that the deceased threatened to attack him or seriously provoked him even though the defendant testifies that the actual killing was accidental and there is no other evidence of such threats or provocation. To the extent that these cases appear to support this proposition we do not believe that such a proposition is in accord with the law on voluntary manslaughter and self-defense. Where, by defendant's own testimony, a killing is accidental, instructions on voluntary manslaughter and justifiable use of force should not be given unless there is some evidence from which the jury could find that the killing was the result of the threats or provocation that preceded it. In our opinion the trial court properly refused defendant's instructions on voluntary manslaughter and justifiable use of force.

## II, III.

In his second argument defendant contends that the State's cross-examination of defendant was improper and prejudicial. In his third argument he maintains that the State improperly argued facts not based on the evidence to the jury. Since these issues are interrelated, we consider them together.

On direct examination defendant testified that he called the police immediately after the shooting. During cross-examination the prosecutor asked defendant, "Did you say that it is murder to the police?" Defense counsel objected to the question, and the jury was excused. The prosecutor informed the court that he had a tape of a telephone call purportedly made by defendant to the police in which defendant used the word "murder" to describe what had happened to his wife. Based on that representation the court overruled defendant's objection. The prosecutor expressed his intention to play the tape for defendant in front of the jury and then ask him whether that was the call which he mentioned on direct examination. The court advised the prosecutor that there would be no need to play the tape in the event defendant admitted that he used the phrase attributed to him by the prosecutor. With this understanding the jury was recalled and defendant was asked,

> "Q. Do you recall a person asking you, to say you have to tell why, and you said it is a murder, 'There is a murder involved, and I just shot my wife?'
>
> Mr. Rotenberg: Objection. It is not proper impeachment.

The Court: Overruled.

Mr. Rotenberg: I move for mistrial.

The Witness [Defendant]: I told them person shot.

Mr. Kelly: Q. Did you tell them there was a murder involved?

A. I might have say. I don't know. I was so upset. I don't know what I was saying."

No tape was introduced into evidence. In argument both prosecutors stated that defendant had admitted to murdering his wife when he told the police operator, "There was a murder." Defense cousel objected to the first such reference, stating that, "I don't think that he ever said that in response to the question. He said that he must have said." The court overruled the objection and invited defense counsel to respond to it in his own argument. He did not do so and failed to object when the matter was again raised in the State's rebuttal argument.

Defendant contends that he did not admit telling the police that "there was a murder involved" or that he had committed a murder. As a consequence, the State improperly insinuated that such statements had been made without producing the supporting evidence and improperly argued them to the jury. The People respond that the cross-examination was proper. We do not agree with the People.

██ On cross-examination a witness may be impeached by statements or acts inconsistent or at variance with his trial testimony. When a witness neither directly admits nor denies the prior inconsistent statement or act, it is competent to prove the affirmative by way of impeachment so long as it pertains to a material issue in the case. (*People v. Preston* (1930), 341 Ill. 407, 419, 173 N.E. 383; *People v. Bush* (1963), 29 Ill. 2d 367, 372, 194 N.E.2d 308.) Were it not for this rule, "the witness might, in every such case, exclude evidence of what he had said or done, by answering, that he did not remember." *Ray v. Bell* (1860), 24 Ill. 444, 451.

The question which these cases leave unanswered is whether proof of the inconsistent statement *must* be presented if the witness claims not to remember the statement or gives an evasive or uncertain response. Although there is some authority to the contrary (see *Vancil v. Fletcher* (1967), 90 Ill. App. 2d 277, 284, 232 N.E.2d 789), the weight of authority requires the cross-examiner to prove that the prior statement was made. (See *Goldstein v. Hertz Corp.* (1973), 16 Ill. App. 3d 89, 97, 305 N.E.2d 617; *Schoolfield v. Witkowski* (1964), 54 Ill. App. 2d 111, 125, 203 N.E.2d 460; *Sellers v. Hendrickson* (1977), 46 Ill. App. 3d 549, 554, 360 N.E.2d 1235.) We enunciated this principle in *Crespo v. John Hancock Mutual Life Insurance Co.* (1976), 41 Ill. App. 3d 506, 520, 354 N.E.2d 381: "Extrinsic evidence, either oral or documentary, need not be introduced if the witness unequivocally admits making the out-of-court statement, but if the witness denies or fails to recall making the prior statement, then it is

incumbent upon the examining party to offer evidence of that statement. [Citations.]" (Accord, *Rigor v. Howard Liquors, Inc.* (1973), 10 Ill. App. 3d 1004, 1009-10, 295 N.E.2d 491.) The same principle applies to criminal prosecutions. (*People v. Saunders* (1971), 132 Ill. App. 2d 421, 425, 270 N.E.2d 217; *People v. Williams* (1969), 105 Ill. App. 2d 25, 34, 245 N.E.2d 17.) Accordingly, we conclude that it was error for the State not to introduce proof of defendant's alleged statement to the police that "there is a murder involved." We do not, however, find that this error requires granting defendant a new trial.

■■ A failure to follow through with proof of a prior inconsistent statement is not always reversible error. (*Saunders; Williams.*) Even in the absence of proof of an admission, a prosecutor's reference to an admission by the defendant does not require reversal where there is positive evidence of guilt. (*People v. Allen* (1959), 17 Ill. 2d 55, 63, 160 N.E.2d 818; *People v. Cain* (1979), 70 Ill. App. 3d 1, 7, 388 N.E.2d 54.) We have recently considered a similar question in *People v. Wilson* (1981), 92 Ill. App. 3d 370, 415 N.E.2d 1315, where the prosecutor attributed the statement, "I killed him," to the defendant when there was no evidence whatsoever that that particular admission had been made. Although we condemned that remark as a grossly improper misstatement, we affirmed the defendant's conviction because of the strong evidence of her guilt. The remarks in the instant case fall far short of the error condemned in *Wilson.* In light of the evidence of defendant's guilt which we have set forth previously in this opinion, we are unable to conclude that the complained of questions and comments represented a material factor in the convictions or that the verdicts would have been different had they not been made. *People v. Barnett* (1975), 34 Ill. App. 3d 174, 178-79, 340 N.E.2d 116.

■■ Defendant has also objected to the prosecutor's questions to defendant regarding whether he told the police he was "angry" with his wife. Defendant denied that he had ever said that. Investigator Miller testified in rebuttal, however, that defendant said that he had "argued" with his wife. Although defendant did not use the word "angry," we find no prejudice in this comment.

■■ Defendant was asked on cross-examination whether, when he called the police, he informed them that he lived on the fourth floor of the apartment building and not on the ground floor. Defendant denied this and the State introduced no evidence to controvert that denial. No objection was made to the question when it was asked, however, and defense counsel brought out on redirect examination the fact that the names "Frank Delarosa" and "Esperansa Delarosa" appeared on the door to their apartment and on their mailbox. Officer Czapiewski previously testified that when he and his partner responded to the message of a

woman shot at 4415 North Lawndale, he had a name, presumably that of the victim's. It is apparent, therefore, that defendant was not prejudiced by the prosecutor's question.

Defendant complains of the following question asked on cross-examination:

> "Q. Sir, at the time your wife was shot, isn't it in fact true that you heard her call the police and say that you were beating on her, and that is the reason you shot her before the police arrived to answer that call?
> A. No."

The trial judge sustained defendant's objection to the question and instructed the jury to disregard it. Normally this prompt action by the court will correct the error. (*People v. Carlson* (1980), 79 Ill. 2d 564, 577, 404 N.E.2d 233.) The prosecutor, however, returned to this theme in closing argument when he said that the victim had called the police because "she was beaten." Defendant's objection to this remark was overruled. We must express our disapproval of the State's comment where no evidence was introduced that defendant had been beating his wife. The comment was not based on the evidence, and we cannot concur with the State that this was "reasonably inferred from the testimony" that she had called the emergency police number. We do not, however, believe that this error requires reversal of defendant's convictions.

There is a distinction to be made between condemnation of errors because of the manner and intent with which they were made and a finding that those errors could in fact have prejudiced defendant's right to a fair trial. (*People v. Whitley* (1977), 49 Ill. App. 3d 493, 505, 364 N.E.2d 511.) The possibility of prejudice to defendant was minimized by the uncontroverted testimony of the pathologist that he observed no bruises or discoloration on the victim's arms or hands. This testimony tended to negate any inference the prosecutor sought to create that the victim had been beaten. Upon our review of the evidence we do not find that the error could have influenced the jury's verdicts.

■■ Finally, defendant objects to the prosecutor's attempt to cross-examine defendant on the basis of the pathologist's testimony regarding the path of the bullets fired into the victim's thigh and navel. Defendant correctly points out that the prosecutor misstated Dr. Choi's testimony. The bullet that entered the victim's thigh proceeded in a "mildly leftward and backward and upward direction," not, as the prosecutor said, in a "downward direction." The bullet that entered her navel traveled in a "backward and mildly downward direction," not "straight in" as the prosecutor suggested. Defendant cites *People v. Graves* (1978), 61 Ill. App. 3d 732, 378 N.E.2d 293, in support of the proposition that this line of questioning was improper.

The error in *Graves* was that the pathologist did not describe the course of the bullets and the defendant did not recall his testimony. In the case at bar, the course of the bullets was known to the jury, and defendant did acknowledge hearing the pathologist's testimony. Moreover, defense counsel objected to this questioning in *Graves* which counsel failed to do here. The improper cross-examination in *Graves* was only one of a multitude of errors in cross-examination, improper exclusion of evidence and erroneous jury instructions which led to the reversal of the defendant's conviction. We do not have the same errors in the record before us. The prosecutor's misstatement of Dr. Choi's testimony regarding the path of the bullets did not, in our opinion, cause defendant to experience any substantial prejudice.

## IV.

Defendant's fourth argument on appeal is that the prosecutor improperly used defendant's post-arrest silence in an effort to impeach defendant's explanation at trial as to how the victim met her death. Defendant testified that the victim was killed accidentally when their dog jumped on defendant's arm, causing his gun to discharge three times. At several points in cross-examination the assistant state's attorney asked defendant whether he had related this account to the police following his arrest. Defendant admitted that he did not. In argument the prosecutor characterized defendant's trial testimony as a "different story" from the statements he made to the police. Defendant contends that this cross-examination and comment requires reversal of his convictions because it constituted an impermissible reference to his post-arrest silence in violation of *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240. We do not agree.

In *Doyle*, the Supreme Court held that it is fundamentally unfair and a deprivation of due process for the prosecution to attempt to impeach a defendant who offers an exculpatory story at trial with his failure to offer that statement to the police following his arrest. Our own supreme court has extended this rule to circumstances where there is no evidence that the defendant was previously given his *Miranda* warnings. *People v. Beller* (1979), 74 Ill. 2d 514, 521, 386 N.E.2d 857.

There are, however, two situations in which the prosecution may comment on post-arrest silence. If the defendant who offers an exculpatory version of events at trial claims falsely to have told the police the same version upon arrest, he may be impeached with evidence that he did not in fact do so. (*Doyle v. Ohio* (1976), 426 U.S. 610, 619-20 n.11, 49 L. Ed. 2d 91, 98 n.11, 96 S. Ct. 2240, 2245 n.11.) And if defendant's exculpatory statement at trial is manifestly inconsistent with statements he made after his arrest, comment or questioning about his failure to give the

same statement at the time of arrest is not improper in the context of eliciting that contradiction. (*Anderson v. Charles* (1980), 447 U.S. 404, 407-08, 65 L. Ed. 2d 222, 226, 100 S. Ct. 2180, 2182; *Beller*, at 524-25; *People v. Rehbein* (1978), 74 Ill. 2d 435, 442-43, 386 N.E.2d 39.) In determining whether the prosecution has impermissibly commented on the defendant's post-arrest silence, the cross-examination must be considered in its entirety. *Anderson v. Charles* (1980), 447 U.S. 404, 407-08, 65 L. Ed. 2d 222, 227, 100 S. Ct. 2180, 2182.

Applying the foregoing principles to the facts in the case at bar, we find that the cross-examination and argument on defendant's failure to tell the police the story that he related at trial falls within the second exception. Defendant testified that he told the police "the circumstances [that] happened," and that he had shot his wife in self-defense. Defendant never informed the police that the victim had been killed accidentally when their dog jumped on defendant's arm, causing his weapon to discharge. His explanation at trial was obviously inconsistent with his post-arrest statements to the police. In our judgment it was not improper for the prosecutor, in the course of bringing these inconsistencies to the attention of the jury, to question and comment upon defendant's failure to mention his trial explanation to the police following his arrest. (See *In re S.L.C.* (1979), 75 Ill. App. 3d 473, 394 N.E.2d 687.) The authorities on which defendant relies, *People v. Robinson* (1976), 44 Ill. App. 3d 447, 358 N.E.2d 43, and *People v. Foster* (1980), 81 Ill. App. 3d 915, 401 N.E.2d 1221, are distinguishable because in neither case was there a direct contradiction or obvious inconsistency between the defendant's post-arrest statement and his exculpatory trial account.

For the foregoing reasons we affirm the judgments of the circuit court of Cook County.

Affirmed.

HARTMAN, P. J., and STAMOS, J., concur.