THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAR-
RYL JEFFERSON, Defendant-Appellant.

First District (2nd Division)    Nos. 1—90—3073, 1—92—0909 cons.

Opinion filed December 28, 1993.

Rita A. Fry, Public Defender, of Chicago (Evelyn G. Baniewicz, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Eileen O'Neill, and Mary Morris, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

Following a jury trial, defendant Darryl Jefferson was convicted of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1 (now codified as 720 ILCS 5/9—1 (West 1992))), and sentenced to 30 years in the custody of the Department of Corrections. On appeal,[1] defendant contends that (1) the circuit court erred when it failed to instruct the jury on second degree murder; (2) the court improperly commented on the evidence during defendant's closing argument and abused its discretion when it failed to adequately respond to the jury's request for clarification; (3) his right to a fair trial was prejudiced by some of the State's remarks during closing argument; and (4) the court improperly denied his challenges for cause with respect to three prospective jurors.

---

[1]Case number 1—90—3073 is defendant's direct appeal from his conviction. Case number 1—92—0909 is an appeal from the denial of defendant's petition for a writ of *mandamus* against the clerk of the circuit court. Defendant sought a writ against the clerk requiring her to provide him with a copy of his trial transcript. That appeal was rendered moot, however, when defendant filed the record on appeal, including the report of proceedings at trial.

At trial, Richard Porter testified that on November 10, 1989, he had just completed the first week of a security guard training course in downtown Chicago that he had been attending with defendant and codefendant James Harrison.[2] At approximately 6 p.m., the three men left the school and went to Porter's home on the south side of Chicago. After watching television for 15 to 20 minutes, they purchased two six packs of beer and a pint of gin and then went to Harrison's house, where they spent the next few hours drinking, making one additional trip to the store for more alcohol. Later that evening, after finishing all the beer and gin, they walked to a nearby bar where they drank and danced until it closed at 1:30 a.m. While they were at the bar, defendant began arguing with a woman when she called him names because he refused to buy her a drink. Harrison broke up the argument and brought defendant back to their table; however, defendant continued to complain about the woman.

After they left the bar, the three men walked to Harold's Chicken Shack at 75th and King Drive. After placing their order, they sat in a booth and waited for their meal. Defendant was still complaining about the woman at the bar and, in a loud voice, referred to her as a "bitch" and a "ho." Michael Young, an off-duty deputy sheriff who was waiting to place his order, left his place in line and approached the table. Young told defendant to "watch [his] mouth" and defendant responded that Young was not his mother or father. Young then resumed his place in line, and the three men continued to talk loudly.

After a couple of minutes, Young returned to the table and pulled out a gun, holding it approximately four to five inches from defendant's face. He then slapped defendant across the face with his other hand approximately 10 to 15 times, causing defendant's glasses to fall off his face. Young then told defendant that he would "blow his brains out." Defendant became "extremely angry" and told Young that he would prove to him that he was not a "punk." Young then returned the gun to his side and returned to his place in line. Defendant attempted to leave his seat and approach Young, but Porter grabbed him and hurried him out of the restaurant.

Once outside, Porter tried to convince defendant to "leave it alone" and go to another restaurant a few blocks away. Defendant ignored the advice, reentered the restaurant with Harrison, and approached Young. Through the window, Porter saw the two men on

---

[2]James Harrison was indicted for murder with defendant. Separate, simultaneous trials were held. Harrison elected a bench trial and was acquitted by the circuit court.

either side of Young, pushing him between them. When Young started to walk towards the door, defendant and Harrison pushed him outside. Young then began walking towards a police paddy wagon parked across the street. At first, defendant and Harrison followed Young, but then they pushed him back onto the sidewalk and up against a wall. Although Young twice yelled for help, he did not pull out his gun or fight with defendant or Harrison in any way. They then "patt[ed] him down" and defendant found the gun. Defendant pointed the gun at Young's temple, Young turned his head, and the gun went off. Defendant and Harrison then started to walk away along King Drive, but the police came and placed them in custody.

Cynthia Gaines, a cashier at the restaurant, testified that she saw Young holding a pistol and slapping defendant. Afterwards, Young put the gun away and returned to the counter. Defendant left the restaurant with the two men he was sitting with, but then reentered and retrieved his hat. He then approached Young and said that he should not have "disrespected" him. She noticed that defendant appeared "upset" at the time. Harrison then entered the restaurant and came up to the counter, where he stood on the other side of Young. Defendant then began pushing and shoving Young outside. Young did not resist in any manner; he exited the restaurant and began walking towards a police wagon parked across the street. He stopped and turned around, however, and walked out of her view. Shortly thereafter, she heard a "pop" type of noise.

Larry Lee Wright testified that at approximately 2:15 a.m. on November 11, 1989, he was preparing to use a payphone when he heard some noises coming from Harold's Chicken Shack located across the intersection. When he looked over, he saw three people standing outside the restaurant arguing. He then saw defendant take off his shirt and say that he was going to go back inside and beat somebody up because he was "mad."

About five or six minutes later, defendant, Harrison, and Young came out of the restaurant, and defendant and Harrison began pushing Young up against a wall. Defendant then reached in Young's coat and pulled out a gun. Defendant first took three steps away from Young, but then turned around, placed the gun at his temple, said "pow" and pulled the trigger. Defendant and Harrison then began walking away. When the police ordered defendant to stop, he laid the gun on the ground, threw his hands in the air, and "hollered" that he did not shoot him.

On cross-examination, Wright stated he originally told the police that after he saw defendant enter the restaurant, he drove home but returned several minutes later to buy a pack of cigarettes. When he

returned, he observed defendant and Harrison pushing Young and the shooting that followed.

Joseph Jeter testified that when he pulled up at Harold's Chicken Shack at 2:15 a.m. on November 11, 1989, he saw defendant and Harrison pushing Young as he was walking across the street towards a paddy wagon. As they were pushing him, Young turned around and began walking towards the restaurant. Harrison then grabbed Young and held him up against a wall while defendant reached under Young's coat and took his pistol. Defendant took seven or eight steps away from Young. Defendant appeared "very angry," called Young a "motherfucker," and "holler[ed]" about being "disrespected." He then turned back around, placed the gun up to Young's head, and shot him. After he shot Young, defendant began walking away. Four or five seconds later, the police arrived and Jeter identified defendant as the shooter.

Chicago police officer David Perkins testified that he was off duty when he stopped to pick up something to eat at Harold's Chicken Shack at approximately 2:15 a.m. on November 11, 1989. As he was parking his van next to a police wagon across the street from the restaurant, he noticed three men arguing as they exited the restaurant. Because his windows were rolled up, however, he was unable to hear what they were arguing about. He then noticed two of the men, defendant and Harrison, grab the third person and push him back to a wall. After a short conversation at the wall, defendant "sudden[ly]" pulled out a gun. When the man against the wall turned to look over his shoulder, defendant shot him in the head. Perkins then exited his vehicle and he saw two uniformed police officers coming out of a store. He told them what he observed and they arrested defendant and Harrison.

Chicago police officer Lawrence Dix testified that on the date in question, he and his partner were speaking with the owner of the liquor store across the street from Harold's Chicken Shack when they received a radio report of a man with a gun in the area of 75th and King Drive. When they came out of the store, they were approached by Perkins, who told them that a man was shot and that the two offenders were walking away. Dix then looked across the street and saw a person lying on the ground and then saw two men walking away in different directions. As they were arresting Harrison, two other officers arrived on the scene and stopped defendant. Both men were then placed in the paddy wagon which Dix had previously parked outside the liquor store. They then called an ambulance and began to gather evidence. Dix spoke to Wright, who told him where he could find the gun that was used in the shooting. Dix proceeded to that location and found a .38-caliber revolver lying on the ground.

Chicago police officer Michael Lacey testified that at approximately 2:20 a.m. on November 11, 1989, he and his partner responded to a call of a man with a gun at 75th and King Drive. Upon arriving at that location, Jeter pointed to defendant, who was standing about 90 feet away at the corner, and told them that he had a gun. Lacey told defendant to "freeze" and then apprehended him. At that time, defendant repeatedly stated that he "didn't shoot him." Lacey then placed defendant in the police wagon.

Richard Fournier, a firearms examiner for the Chicago police department, testified that he examined the gun used by defendant and found that it was a fully functional weapon with both single and double action capacity. He further found that when the weapon was cocked, $4^1/2$ pounds of pressure were necessary to fire it, and that $9^1/2$ pounds were necessary when the hammer was at rest. He concluded that the gun did not have a "hair trigger" and that dropping the gun, or even knocking the hammer, would not cause the gun to discharge accidentally.

Dr. Shaku Teas of the Cook County medical examiner's office testified that she conducted an autopsy on Young and determined that the cause of death was a gunshot wound behind the left ear. She also determined that the weapon was in contact with the skin from the large amount of powder and soot around the wound. On cross-examination, she stated that the alcohol level in Young's blood was .231; the alcohol level in his bile was .273; and the alcohol level in his urine was .367.

After the court denied defendant's motion for a directed verdict, defendant testified in his own behalf. He stated that on November 10, 1989, he had completed his first week of security guard training and went out with Harrison and Porter that night. At about 2 a.m., they went to Harold's Chicken Shack at 75th and King Drive and ordered some food. While they were waiting for their order, they started talking loudly about the girls that they had met that night. As they were talking, Young approached him and called him a "stupid motherfucker." Young then pulled out a gun, threatened to kill him, and began slapping him with his other hand. Young slapped him approximately 10 times while holding the gun between four and five inches away from his face. Young then returned the gun to his pants and stepped away. Defendant then stood up because he was "real angry" at Young, but Porter pushed him outside. Once outside, Porter told him "to leave it alone," but because he was angry and was not afraid of Young, he said that he was going to go back in to get his hat. When he tried to enter the restaurant, the manager stopped him and told him to "cool off." He then told the manager

that he was just going back in to get his hat and glasses. After he retrieved his hat and glasses, he approached Young and told him that "he had no business disrespecting" him because he had done nothing to him. Harrison then came in and told them that there was a police wagon parked across the street and asked Young if he would step outside. Young agreed and the three exited the restaurant.

As they were walking across the street, they noticed that the wagon was empty, so they turned around and headed back toward the restaurant. Because Young was stumbling, defendant grabbed his arm and brought him to a wall. Young then reached for his gun, but defendant grabbed it first, cocked it, and held it about three inches from Young's head. He explained that although he had no intention of shooting Young, he cocked it because he wanted to wait for the police to get there. Someone then screamed something from across the street, and Young turned his head, bumping it into the gun and causing it to fire accidentally. After the shooting, defendant walked to the corner of 75th and King Drive where he was arrested.

On cross-examination, defendant denied pushing Young inside the restaurant, but admitted doing so once when they were outside.

As previously noted, the jury found defendant guilty of first degree murder and the court sentenced him to 30 years' imprisonment. This appeal followed.

Defendant first contends that the circuit court erred when it refused his request to instruct the jury on second degree murder. He asserts that the instruction was warranted because there was sufficient evidence to establish that he "was acting under a sudden and intense passion at the time when Michael Young was shot," despite the fact that he testified that the shooting was unintentional. He maintains that Young's striking him repeatedly in the face, as well as pointing a gun at him, constituted serious provocation, because it was "conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(b) (now codified as 720 ILCS 5/9—2(b) (West 1992)).) The State responds that the court properly rejected the proposed instruction because insufficient evidence existed of an overwhelming passion which caused defendant to kill Michael Young.

During the instruction conference, defendant tendered to the court instructions on both second degree murder and involuntary manslaughter. The court agreed to give the involuntary manslaughter instruction due to defendant's testimony that the gun discharged accidentally. It rejected the proposed instruction on second degree murder, however, because there was no evidence of sufficient passion. The court stated:

"[THE COURT] [W]here is the killing in the heat of passion[?] [Defendant] testifie[d] that he never intend[ed] to do it, it [was a] mere accident.

\* \* \*

[I]t seems to me that the clear evidence \*\*\* from \*\*\* the State's theory of the case is an intentional killing[.] \*\*\* [Defendant's] story, obviously is a good deal different, but I don't get from his story a killing \*\*\* in the heat of passion[.] I get an accident or perhaps recklessness in pointing the gun at somebody's head."

Illinois law is well settled that a defendant is entitled to have the jury instructed on any defense which the evidence supports, even if the evidence is "slight." (See *People v. Everette* (1990), 141 Ill. 2d 147, 156, 565 N.E.2d 1295, 1298.) This is true even if the instruction is based upon facts which are inconsistent with the defendant's own testimony because he is entitled to the benefit of any defense shown by the whole of the evidence. (*Everette*, 141 Ill. 2d at 156, 565 N.E.2d at 1298 (holding that claims of accidental death and self-defense are not inherently contradictory); see also *People v. Whiters* (1992), 146 Ill. 2d 437, 441-42, 588 N.E.2d 1172, 1174 (holding that the jury should have been instructed on self-defense even though the defendant testified that the killing was accidental); *People v. Robinson* (1987), 163 Ill. App. 3d 754, 761, 516 N.E.2d 1292, 1298-99, *appeal denied* (1988), 119 Ill. 2d 570, 522 N.E.2d 1253.) Furthermore, the question as to whether a defendant has met the evidentiary minimum is a matter of law. (*Everette*, 141 Ill. 2d at 157, 565 N.E.2d at 1299.) Nevertheless, an instruction will not be justified if it is wholly unrelated to the case and is based on the merest factual reference or witness comment. (*Robinson*, 163 Ill. App. 3d at 761, 516 N.E.2d at 1298.) Thus, "[j]ury instructions on voluntary manslaughter[3] are not always proper in every case in which some provocative conduct on the part of the deceased is alleged." (*People v. Neal* (1983), 112 Ill. App. 3d 964, 966, 446 N.E.2d 270, 273; see also *People v. Boone* (1987), 152 Ill. App. 3d 831, 837-38, 504 N.E.2d 1271, 1276 (holding that an instruction on voluntary manslaughter was not warranted when the defendant testified that the death was accidental and no other evidence existed as to serious passion); *People v. Purrazzo* (1981), 95 Ill. App. 3d 886, 895, 420 N.E.2d 461, 467, *cert. denied* (1982), 455 U.S. 948, 71 L. Ed. 2d 661, 102 S. Ct. 1448 (same).) Instead, sufficient evi-

---

[3]Because the statute defining second-degree murder was specifically intended to retain all substantive law previously applicable to voluntary manslaughter, our reliance on voluntary manslaughter cases is appropriate. See *People v. Timberson* (1991), 213 Ill. App. 3d 1037, 1043, 573 N.E.2d 374, 377.

dence must exist that at the time of the killing, the defendant was acting under a sudden and intense passion resulting from serious provocation by the individual killed. See *People v. Williams* (1991), 215 Ill. App. 3d 800, 808-09, 576 N.E.2d 68, 73, *appeal denied* (1991), 142 Ill. 2d 664, 584 N.E.2d 139.

■ Only four categories have been recognized as constituting serious provocation: (1) mutual quarrel or combat; (2) substantial physical injury or assault; (3) illegal arrest; and (4) adultery with the offender's spouse. (*People v. Chevalier* (1989), 131 Ill. 2d 66, 71, 544 N.E.2d 942, 944.) Mutual combat has been defined as "a fight or struggle which both parties enter willingly or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight upon equal terms and death results from the combat." (*Neal*, 112 Ill. App. 3d at 967, 446 N.E.2d at 274.) Clearly this category does not apply to the instant case since defendant and Young did not both enter the altercation willingly, nor did they "mutually fight upon equal terms." Instead, Young initially accosted defendant when he brandished a weapon and began slapping him, and defendant continued the confrontation by forcibly removing Young from the restaurant and pushing him up against the wall. Therefore, it cannot be said that a serious provocation existed as a result of "mutual combat."

Defendant argues, however, that sufficient evidence was presented that he was acting under an intense passion resulting from the abuse that he endured. We disagree. While we recognize that several witnesses, including defendant himself, testified that he was "angry," "upset," or "mad," those emotions are not necessarily synonymous with "sudden and intense passion." The evidence in this case reveals that defendant and Harrison attempted to escort a timid and unresisting Young to the police paddy wagon, but upon finding it empty, directed him to a nearby wall, placed his arms against the wall and began to frisk him. These actions were consistent with the training they would have acquired at security guard school. Thus, despite the evidence that defendant was "angry," his actions fail to demonstrate any sudden and intense passion. Those actions, combined with defendant's explicit theory of an accidental shooting, render correct the circuit court's finding that there was insufficient evidence that defendant acted out of a sudden and intense passion. Accordingly, we conclude that the circuit court properly denied defendant's proposed second degree murder instruction.

Defendant next contends that the circuit court improperly referred to one of the elements of first degree murder when it ruled on the State's objection to a statement in defendant's closing argument. Defendant asserts that rather than simply sustaining the

objection, the court expressly mentioned one of the elements of the offense, thereby benefiting the State by bolstering its objection and "undercutting" his closing argument. The State responds that the court was merely correcting defense counsel's incorrect statement of the law and that he suffered no prejudice as a result.

During closing arguments, defense counsel stated:

"[DEFENSE COUNSEL]: As I said before, *** the only way you can find conviction [*sic*] of first degree murder [is] if you say that [defendant] pulled this trigger intentionally.

[PROSECUTOR]: Objection, Judge, that is not the law.

[DEFENSE COUNSEL]: Oh, Your Honor, I'm sorry but it is.

[THE COURT]: Well, I believe that the instructions are going to be received on first degree murder go as well to knowledge as to knowing that such acts create a strong probability of death or great bodily harm. Objection sustained."

Defendant relies on *People v. Heidorn* (1983), 114 Ill. App. 3d 933, 936-37, 449 N.E.2d 568, 572, for the proposition that it is improper for a trial judge to make comments before the jury regarding his opinion of the credibility of a witness or of counsel's argument, because of the "judge's great influence over the jury." However, in that case, the appellate court, after finding improper the court's admonition to defense counsel to "not create false issues," and its statement that it did not understand defense counsel's argument, affirmed the conviction because the defendant was unable to demonstrate how he was prejudiced by the comment. *Heidorn*, 114 Ill. App. 3d at 937, 449 N.E.2d at 573.

In the case at bar, unlike *Heidorn*, the court's remark did not state an opinion concerning the argument, but merely clarified what the instructions would be, something that was entirely appropriate. Defendant was not prejudiced by the remark.

Defendant also asserts that the circuit court "exacerbated" the problem when it improperly responded to the jury's request for clarification of the instructions regarding the requisite mental states for first degree murder and involuntary manslaughter. He maintains that the court breached its duty to clarify the instructions when it responded to the request by directing the jury back to the original instructions because the note "clearly indicate[d] confusion as to the intent elements." The State responds that defendant has waived this issue because he failed to object to the court's response in a timely manner, and in the alternative, the circuit court properly exercised its discretion when it refused to clarify the instructions aside from directing the jury back to the original instructions.

During their deliberations, the jury sent three notes to the court.

One asked for certain testimony, a second requested a clarification of the instructions, and the last asked about the consequences of their failure to come to a unanimous decision. The request for clarification was written on the original instructions and directed the court to certain bracketed phrases. Those bracketed phrases were as follows:

> "he knew that his acts created a strong possibility of death or great bodily harm to Michael Young." (From the murder instruction.) "That those acts were likely to cause death or great bodily harm." (From the involuntary manslaughter instruction.)

The court responded by sending a note to the jury informing them "that they had the instructions and they would have to decide these issues based upon" them. The next day, defense counsel, upon being told of the court's response, began to argue that the note indicated that the jurors were confused and the response was inappropriate, when the sheriff announced that the jury had reached a verdict. In his motion for a new trial, defendant raised the issue of the jury's question and the court's response.

Although a defendant who "acquiesces in the circuit court's answer to the jury's question *** cannot later complain that the circuit court abused its discretion" (*People v. Reid* (1990), 136 Ill. 2d 27, 38, 554 N.E.2d 174, 179), we are unable to conclude that waiver occurred here because the record is silent as to whether the court conferred with the parties before responding to the jury's request. For purposes of this appeal, we assume that the issue was properly preserved for review.

■ We believe, however, that the circuit court's response represented a proper exercise of its discretion. A court may, in its discretion, refrain from clarifying an instruction if the given instructions are readily understandable and sufficiently explain the relevant law. (See *People v. Coleman* (1991), 223 Ill. App. 3d 975, 1004, 586 N.E.2d 270, 289-90, *appeal granted* (1992), 145 Ill. 2d 637, 596 N.E.2d 632.) Furthermore, the denial of a jury's one-time request for clarification is not an abuse of discretion, even when the request involves the definition of the requisite mental state. (*People v. Waldron* (1991), 219 Ill. App. 3d 1017, 1040-41, 580 N.E.2d 549, 565-66 (holding that the circuit court properly exercised its discretion when it responded to the jury's one-time request for the definition of "intent" by referring back to the original instructions).) Because the jury's request in this case essentially sought an explanation of what satisfied the necessary mental state, we cannot say that the court abused its discretion by referring the jury back to the original instructions. Moreover, the conclusion that the jurors were not confused by the instruction is bolstered by the fact that the question

was asked only once and the jury reached a verdict a short time later. We therefore conclude that no abuse of discretion occurred.

Defendant next contends that he was denied a fair trial due to several remarks made by the State during its closing argument. Defendant contends that the remarks were a misstatement of the law and were made "to inflame the passions of the jury" and prejudice the jury against defendant. The State responds that the remarks were proper comments on the evidence in the record and were invited by defendant.

The law is well settled that a prosecutor is entitled to wide latitude when making a closing argument. (See *People v. Cisewski* (1987), 118 Ill. 2d 163, 175, 514 N.E.2d 970, 976; *People v. Morrison* (1985), 137 Ill. App. 3d 171, 184, 484 N.E.2d 329, 338.) Moreover, the scope of permissible argument is within the sound discretion of the circuit court. (*People v. Lewis* (1990), 198 Ill. App. 3d 976, 982, 556 N.E.2d 697, 701.) In order to constitute reversible error, the prosecutor's remarks must have caused substantial prejudice to the accused, such that the jury would have reached a different result if not for those remarks. (*Morgan*, 112 Ill. 2d at 132, 492 N.E.2d at 1311.) When assessing an alleged impropriety, a reviewing court must examine the closing arguments of both the State and the defendant in their entirety and the complained-of remarks in their proper context. *Cisewski*, 118 Ill. 2d at 175-76, 514 N.E.2d at 976.

Defendant first challenges the following statement made by the prosecutor:

> "The judge will determine what will happen to Mr. Harrison, however, you may consider the actions of Mr. Harrison on that day as well in determining the guilt of [defendant]."

Defense counsel objected to the statement, but the court overruled the objection.

On appeal, defendant contends that this was a misstatement of the law because defendant was tried as the principal rather than an accomplice and that therefore the jury would not be instructed on accountability. Defendant cites *People v. Heflin* (1978), 71 Ill. 2d 525, 376 N.E.2d 1367, *cert. denied* (1979), 439 U.S. 1074, 59 L. Ed. 2d 41, 99 S. Ct. 848, as support for his contention. However, in *Heflin*, the court held only that a statement which misstated the law of accountability is improper. (*Heflin*, 71 Ill. 2d at 543, 376 N.E.2d at 1375.) In that case, the prosecutor argued to the jury that they could find the defendant guilty of murder even if they found that another pulled the trigger because he "applied psychological pressure on her, causing her to shoot her husband." (*Heflin*, 71 Ill. 2d at 543, 376 N.E.2d at 1375.) The court held that the prosecutor misstated the law

of accountability because psychological pressure would not support a guilty verdict by itself. Instead, the defendant had to have the intent to commit murder when he aided and abetted the shooter. The court held that although the statement was improper, because defense counsel objected and the court sustained the objection, the defendant was not prejudiced. *Heflin*, 71 Ill. 2d at 543, 376 N.E.2d at 1375.

The State cites *People v. Batchelor* (1990), 202 Ill. App. 3d 316, 559 N.E.2d 948, *appeal denied* (1990), 135 Ill. 2d 559, 564 N.E.2d 840, for the proposition that even though a defendant is tried as a principal, it is proper to remark on accountability during closing argument. In *Batchelor*, the defendant was indicted for murder with another person but tried separately. Defendant was tried as a principal in the murder, but the State requested and received an instruction on accountability because there was some evidence that he gave the gun away and someone else did the shooting. (*Batchelor*, 202 Ill. App. 3d at 330-31, 559 N.E.2d at 958-59.) The State also mentioned accountability in its closing argument. On appeal, the court held that it was proper to refer to accountability in the argument, and to give the instruction, even though the State's theory of the case was that he was the principal because the evidence supported a theory of accountability. *Batchelor*, 202 Ill. App. at 332-33, 559 N.E.2d at 959-60.

■ In this case, the prosecutor did not misstate the law of accountability as in *Heflin*. Instead, he merely asserted to the jury that they could consider Harrison's actions when determining defendant's guilt. Indeed, the totality of evidence should be considered by the fact finder. We find no basis for concluding that defendant was prejudiced by these remarks of the prosecutor.

Defendant also contends that the prosecutor improperly inflamed the passions of the jury when he contrasted the defendant's constitutional rights with the circumstances of Young's death. Defendant takes issue with several statements in the State's rebuttal argument:

> "[PROSECUTOR]: [Defendant] has had only every right that he is entitled to, the right to be confronted by the witnesses.
> [DEFENSE COUNSEL]: Objection.
> [DEFENSE CO-COUNSEL]: Objection, Your Honor.
> [THE COURT]: Objection overruled.
> [PROSECUTOR]: The right to confront the witnesses and cross examine them when they come in here into court and say what they saw on the morning that this occurred. The right to have a jury selected by him and the [P]eople, to hear the case and fairly decide the issues concerning his guilt.

He's had all those rights, he's had a fair trial by you and by this Judge. He's had the witnesses come into court. What kind of trial did he give Mr. Young there—

[DEFENSE COUNSEL]: Objection.

[PROSECUTOR]: —in the street on the—

[THE COURT]: Objection overruled.

[PROSECUTOR]: He was judge, jury and executioner because he lost face.

\* \* \*

[PROSECUTOR]: Again, [defendant] has had his day in court. His actions are being judged as are the actions of Mr. Young, but when you go back there, think about the end result. Give Mr. Young, now—

[DEFENSE COUNSEL]: Objection, Judge.

[PROSECUTOR]: —his day in court.

[THE COURT]: Overruled.

[PROSECUTOR]: Even though what Mr. Young did, as I said, was not the wisest thing to do, is this what he deserved?

[DEFENSE COUNSEL]: Objection, Your Honor.

[THE COURT]: Overruled."

The State responds that the comments were invited by defendant's attempt to "link[ ] \*\*\* himself to the criminal justice system" in his closing argument by asserting that he may have thought that he was authorized to arrest Young since he was enrolled in security school.

In the case at bar, the statements at issue were not sufficiently passionate to prejudice defendant's right to a fair trial. We first note that it is considered to be permissible argument to refer to a murder defendant as an "executioner." (See *People v. Cunningham* (1988), 177 Ill. App. 3d 544, 553, 532 N.E.2d 511, 517, *appeal denied* (1989), 126 Ill. 2d 562, 541 N.E.2d 1110.) Second, although it is improper to imply that a criminal defendant is "manipulating his constitutional rights to escape conviction" (*People v. Ray* (1984), 126 Ill. App. 3d 656, 662, 467 N.E.2d 1078, 1083 (reversing a conviction and remanding for a new trial when the State made several improper statements, including: "It's about time the Constitution that this man is hiding behind is put in back of him, because it's been his shield for a year and it's over")), the State's argument did not imply that he should be punished for exercising his rights. Rather, the State's argument was directed toward the assertion that defendant was following the law when he attempted to arrest Young. The circuit court did not abuse its discretion when it permitted the remarks.

We are satisfied that the request to give Young his day in court did not "misstate[ ] the function of the jury in our adversarial system [or] diminish the presumption of innocence." (*People v. Thomas*

(1986), 146 Ill. App. 3d 1087, 1089, 497 N.E.2d 803, 804 (finding improper the statement: "There's nobody here for the People, but you").) Instead, the prosecutor's statement merely encouraged the jury to consider the victim of the crime and his conduct during their deliberations.

Defendant's last contention on appeal is that the circuit court improperly denied three of his challenges for cause to prospective jurors. He asserts that each of the three jurors demonstrated during *voir dire* an inability to serve as a competent juror. The State responds that defendant has waived this issue by failing to use peremptory challenges to exclude the jurors, and in the alternative, that the circuit court ruled correctly because "none of the potential jurors had a disqualifying state of mind."

During *voir dire*, when defendant had already used four of his seven peremptory challenges, the parties were presented with a panel of four prospective jurors: Daniel Schnur, Elaine Battel, Kimberly Edwards, and Betty Luning. During questioning, Schnur stated that he was a Chicago police officer for 11 years and that most of his friends were policemen. He stated that because of his background as well as his friends', he believed that defendant was arrested for a "reason." However, he also stated twice that he had no problem with the presumption of innocence or with the fact that the State must prove everything beyond a reasonable doubt.

Battel stated that her parents were the victims of a robbery and a friend of hers was murdered in college. She explained that those incidents would make it difficult to be fair in this case. Following the questioning of the other two jurors, defendant moved to exclude Battel for cause. The court rejected the challenge, stating:

> "[THE COURT]: She said she would have difficulty. She didn't say she couldn't be fair. She would have difficulty because of some matter she wasn't even involved [in]."

Defendant then moved to challenge Schnur on the grounds that "he [d]idn't assure us that he would follow the presumption of innocence." The State's Attorney responded that Schnur twice stated that the defendant is presumed innocent until proven guilty. The court denied this challenge as well. Defendant then exercised two of his peremptories against Schnur and Edwards. He did not peremptorily challenge Battel.

Two additional jurors, David Considine and Priscilla Kretekos, were then called to complete the panel. After the questioning of Considine was completed, Kretekos stated that her nephew was an Arlington Heights police officer and that it "bother[ed]" her that the person killed in this case was an off-duty sheriff. She also stated that

she was "nervous" thinking about a murder trial and that she would do her best to be fair. She then stated that she understood the State bears the burden of proof and that she "guess[ed]" that defendant was innocent until proven guilty, but also stated that she would "like to hear something to prove innocence too." The court then had the following dialogue with her:

"[THE COURT]: Q. [T]he State ha[s] the burden of proving all defendants guilty beyond a reasonable doubt. Do you have any problem with that?

A. No. I know that's the procedure, yes.

Q. Can you abide by that principle?

A. I would certainly try.

Q. As the defendant sits here before you today do you regards [*sic*] him anything other than innocent?

A. I just don't have any opinion.

Q. You don't have any opinion?

A. No.

Q. Well if you were to go back and vote on this case right now, having heard no evidence what would your verdict be?

A. I don't think I could do it one way or the other.

Q. Well that's what I'm trying to tell you. The presumption of innocence means that if you heard no evidence against him you must acquit him because you would have heard nothing that says he committed any crime? That's what would have to be done. I mean does that make sense to you.

A. Yes.

Q. Do you think you could follow that?

A. I'd have to."

Defendant then moved to exclude Kretekos for cause, asserting that despite her responses, she would still not follow the presumption of innocence. The court responded that Kretekos was "typical of any lay person who comes into a courtroom for the first time." The court then denied the motion, explaining that "she has satisfied the test." Defendant then used his last peremptory challenge to exclude juror Considine, and then requested one extra peremptory challenge to exclude Kretekos due to her responses. The court denied the request.

On appeal, defendant asserts that the court erred in denying his challenges to Schnur, Battel, and Kretekos. "[T]he purpose of *voir dire* examination is to filter out prospective jurors who are unable or unwilling to be impartial" (*People v. Washington* (1982), 104 Ill. App. 3d 386, 390, 432 N.E.2d 1020, 1023), and Illinois law is clear that "a person is not competent to [serve] as a juror if his state of mind is such that with him as a member of the jury a party will not receive a fair *** trial." (*People v. Cole* (1973), 54 Ill. 2d 401, 413, 298 N.E.2d

705, 711.) However, the determination that a prospective juror can be impartial is a matter within the sound discretion of the circuit court, and will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. (*People v. Johnson* (1991), 215 Ill. App. 3d 713, 724, 575 N.E.2d 1247, 1253.) Furthermore, a defendant may not challenge on appeal the denial of a motion to excuse for cause a juror who is eventually excluded by use of a peremptory challenge, for he has suffered no prejudice. (See *People v. Foster* (1990), 195 Ill. App. 3d 926, 949, 552 N.E.2d 1112, 1128-29, *appeal denied* (1990), 132 Ill. 2d 549, 555 N.E.2d 380; *People v. Johnson* (1987), 162 Ill. App. 3d 952, 955, 516 N.E.2d 343, 345.) Similarly, such an issue will be considered waived for purposes of appeal if the defendant failed to exercise an available peremptory challenge to exclude the objectionable juror. *People v. Brooks* (1989), 185 Ill. App. 3d 935, 939, 542 N.E.2d 64, 66.

In the instant case, defendant suffered no prejudice from the court's denial of his challenge to prospective juror Schnur because he did not serve on the jury as a result of defendant's peremptory challenge against him. As to prospective jurors Battel and Kretekos, we note that defendant declined to exercise an available peremptory challenge against them, but, in any event, we find no error in the circuit court's refusal to excuse either of them for cause.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McCORMICK, P.J., and HARTMAN, J., concur.