THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARIO
ROSS *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 1—98—4805, 1—99—1623 cons.

Opinion filed March 29, 2002.—Rehearing denied June 6, 2002.

McBRIDE, J., specially concurring in part and dissenting in part.

Rita A. Fry, Public Defender, of Chicago (Evelyn G. Baniewicz, Assistant Public Defender, of counsel), for appellants.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Katherine Blakey Cox, and James D. Ridgway, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAHILL delivered the opinion of the court:

Separate juries found defendants guilty of first degree murder and armed robbery after a simultaneous, severed trial. Defendant Ross was sentenced to 40 years for murder and 10 years for armed robbery. Defendant Hannah was sentenced to 35 years for murder and 10 years for armed robbery. The trial court ordered the sentences to run consecutively for both defendants. This consolidated appeal followed. We affirm in part and vacate in part.

We first set out the evidence presented to both juries, then the evidence presented to each jury separately. The record shows that the State first proceeded against defendant Hannah, then against defendant Ross. We will follow that order here.

The evidence presented to both juries established that Aaron Lanagan was murdered on January 18, 1996, during an armed robbery of his convenience store.

Officer Patricia Black testified that she spoke to a confidential

informant on January 18 in the course of her investigation of the murder and robbery. Black revealed at trial that the informant was Haikeem Hoskins, a member of the Gangster Disciples street gang. Black said that, after her conversation with Hoskins, she began a search for defendant Ross and three other people—all members of the Gangster Disciples gang. Black spoke to Ross on the day of the shooting but did not arrest him.

Detective Stehlik testified that he also investigated the murder and robbery and spoke with Black. Stehlik questioned Ross on January 28, 1996, but did not arrest him for the murder or robbery. Ross was arrested on January 3, 1998.

Officer Alexander Starks testified that, on December 20, 1997, he arrested defendant Hannah for an unrelated offense. Starks brought Hannah to detectives at Area 1 headquarters after speaking with him at the Third District station. Starks then testified about gang organizational structure in the Gangster Disciples. Starks explained that a "coordinator" is first in the chain of command and overlooks the "shorties" or juveniles in the gang. There are separate "coordinators" for gang members above the age of 17. A "coordinator" distributes drugs, collects money and gives orders to the juveniles about a person to "hit." This testimony was taken over objection of both defendants, who questioned Starks' qualifications to testify as an expert on gang organization.

Mary Lanagan, the victim's wife, testified that she and her husband owned the convenience store at the corner of 74th Street and Bishop Avenue. Lanagan said her husband was 65 years old on January 18, 1996.

Lawrence Garfield testified that, on January 18, 1996, he was working as a security guard across the street from the convenience store. Garfield said that he saw two teenagers run into the store, then flee down an alley next to the store. He said the teenagers were dark skinned but he could not see their faces. He said one wore a beige coat and the other a red and black jacket. Garfield said he did not find this conduct unusual, since he frequently saw neighborhood kids go into the store and steal potato chips from a rack near the door. Garfield said that the teenagers he saw ran away with a bag of chips.

A deputy medical examiner testified that the victim died of bullet wounds that lacerated his lungs and heart. This concluded the evidence presented to both juries. The trial court then excused the Ross jury and the following evidence was presented to the Hannah jury.

Assistant State's Attorney Patrick Kelly testified that, on December 21, 1997, he spoke with Hannah after advising him of his constitutional rights. Hannah acknowledged his rights and gave a court-reported statement.

Hannah said in the statement that he was a "coordinator" in the Gangster Disciples street gang. He explained that he was in charge of juveniles. He supervised their drug transactions and gave the proceeds to a fellow "coordinator." Hannah said that, in December 1995, his gang was at war with the Black Stones and was trying to accumulate guns and drugs. Hannah planned to rob the convenience store on Bishop in the middle of January because it was nearby. Hannah admitted that the victim had banned the Gangster Disciples from the store for stealing. Hannah said he called a meeting to plan the robbery. Ross, Jamel and Corey Conley, and "Little Rob" attended. Jamel and Corey are cousins. The purpose of the meeting was to plan how Hannah would commit the robbery and what the assignments of the others would be. Hannah said he planned to "go in and get the money" with a .357-caliber revolver loaded with .38-caliber bullets. Hannah said that the gun belonged to the gang and was kept at an abandoned house on 73rd Street. He told the others they would be security and watch for police from different locations. Ross was to watch the alley next to the store. Corey was to watch the street from 74th to 73rd Street and Bishop Avenue. Jamel was to walk around near the store.

Hannah held a second meeting on January 17, 1996. Hannah decided during this meeting that the robbery would happen the next day, January 18, at 11 a.m. Hannah said he told the others to meet him in an abandoned house near the convenience store at 11 a.m.

Hannah said he was not able to join Ross and the others on the day of the robbery because his mother made him go to school that day. He went to a YMCA after school where he learned of the murder. Hannah later spoke to Ross, who told Hannah that the robbery did not go as planned. Hannah then called an emergency meeting.

At the emergency meeting, Jamel told Hannah that he, Corey and Ross went to rob the store. Jamel admitted shooting the victim, but said that he had not intended to do so. Jamel said that the victim swung a stick at him. Jamel then shot the victim twice. Jamel shot the victim a third time when he noticed the victim was not dead. Jamel told Hannah that the others stood watch as planned in the earlier meeting. Only Jamel went inside the store. Jamel told Hannah that he did not take money, but left with two bags of potato chips and some soda. Hannah then concluded his statement by saying that he had been treated well during his five hours in custody before he gave his statement. This statement was published to the jury.

Detective James Cassidy testified that he was investigating the January 18, 1996, murder and robbery. Cassidy said he was present when Hannah gave his statement. He said that, after Hannah's confession, Cassidy began looking for Jamel Conley, Corey Conley and Ross.

Cassidy said that the Conley cousins were arrested in December 1997 and Ross was arrested on January 3, 1998. The State then called two witnesses, over Hannah's objection.

Teasha Hoskins testified that she received five letters from Hannah while he was incarcerated. She received three in one envelope in the spring of 1998. One letter was for Teasha, and a second directed her to give the third letter to her brother Haikeem.

The letter to Teasha discussed defendant Hannah's belief that Teasha was pregnant with his baby. Hannah then explained why he was in jail:

"The only reason why I'm here is because some [expletive deleted] opened his bill, and if Haikeem wouldn't have quacked, when I get out, I wouldn't have been my dinner."

Teasha explained that Hannah meant that if Haikeem had not told police about his involvement in the January 18 robbery, he would not have been in jail.

Haikeem Hoskins testified that he knew Hannah through his association with the Gangster Disciples. Haikeem said Hannah was a coordinator in the gang. Haikeem said that he knew a man had been killed at the convenience store on January 18, 1996. Haikeem was arrested for aggravated attempted robbery on November 26, 1997. The arrest was unrelated to the murder and robbery on January 18. Haikeem said that, when he received Hannah's letter in the spring of 1998, he had been released from jail. Haikeem then read the letter to the jury:

"Yeah, what's up [expletive deleted.] I found out all the [expletive deleted] that you told them people on November 26, the day they tried to put that cab driver murder on us. I just want to let you know if you was coming to court on me, I don't give a, I mean I just wanted to know if you was coming to court on me. I don't give a [expletive deleted] what you do to them other [expletive deleted.] I'm just concerned about my *** self. Let me give you a word of wise. If you do, you mind [sic] as well kiss yo [sic] life goodbye because that will be the end of, because that will be the last time you see yo [sic] shorty. If you know me, I don't sell woof tickets cause you know I don't have [anything] to do with this, but ain't no love loss [sic] ***. You can tear this paper up now. Boss."

Haikeem testified that he was never charged with a cab driver murder and that the cab driver reference had nothing to do with the January 18 murder and robbery. A series of objections prevented Haikeem from explaining what the letter meant to him. But Haikeem was allowed to testify that he understood Hannah to mean that he did not care if Haikeem implicated the others involved. Hannah was concerned only for himself. Haikeem admitted that he was currently

in custody for a parole violation and had a pending robbery charge. Haikeem denied that he was promised leniency in exchange for his testimony.

On cross-examination, Haikeem admitted that he did not give police Hannah's name when he gave them information about the January 18 murder and robbery.

The State rested its case after presenting the stipulated evidence that a firearms examination revealed that the bullets recovered from the victim's body and at the scene could have been fired from a .38- or .357-caliber revolver.

Gloria Smith, a high school teacher, was the only witness who testified for Hannah. Smith said that, on January 18, 1996, she was teaching a sixth-period physical education class. Smith said the class started at 12:29 p.m. and ended at 1:19 p.m. Smith said that she took attendance that day and that Hannah was present for the whole period.

During a jury instruction conference, Hannah proffered Illinois Pattern Jury Instructions, Criminal, No. 5.04 (3d ed. 1992) (hereinafter IPI Criminal 3d) on withdrawal. The State objected. The court refused to give the instruction, finding that the evidence did not support the defense theory that Hannah effectively withdrew his participation in the robbery and subsequent murder. The Hannah jury found defendant guilty of first degree murder and armed robbery.

Defendant Ross made a motion under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), challenging the State's use of four out of six peremptory challenges after jury selection but before the jury was sworn. The State made a reverse *Batson* challenge in response. The trial court questioned the timeliness of Ross' motion, then denied both motions after a joint *Batson* hearing. The following evidence was then presented to the Ross jury.

Detective Cassidy testified that on January 3, 1998, he told Officer Cedric Parks to "pick up" Ross. Cassidy explained that he had obtained Ross' name from Hannah's statement taken in December. Cassidy admitted that he did not have an arrest warrant for Ross. Cassidy spoke to Ross three times on January 3. Cassidy conducted the first interview alone. The second interview was taken with Assistant State's Attorney (ASA) Kathleen Lanahan present. Cassidy was present for a third interview when Ross gave a court-reported statement to Lanahan. Cassidy denied telling Ross that he could go home after he gave a statement. Cassidy also denied speaking to Ross' mother Delores. Cassidy said that Ross' mother could have spoken to Officer Parks, but he was not sure.

ASA Kathleen Lanahan testified that she took Ross' court-reported

statement on January 3, 1998. Ross said that, on January 18, 1996, he was a 16-year-old member of the Gangster Disciple street gang. Ross said that in 1996 his gang was at war with the Black Stones, a rival gang. A robbery of the convenience store at 74th and Bishop Avenue was planned to fund the "war." Hannah was a coordinator in the gang, which meant he told younger members what to do. Hannah told Ross to be the lookout in the back of the alley. Jamel and Corey Conley were also told to be lookouts near the store. Jamel was told to bring a gun kept at an abandoned house. Hannah was to enter the store and commit the robbery. These assignments were repeated at a second meeting called by Hannah the day before the robbery. Ross met the Conley cousins in an alley behind the store as planned. They waited for Hannah, who never came. Jamel then said he would commit the robbery. He took the .357-caliber revolver he brought from the abandoned house and went into the store. Corey followed him. Ross could not see if Corey also entered the store because Ross stayed in the alley, watching for police. Ross then heard three or four shots and saw Jamel and Conley run down the alley. He hid for a moment, then ran after the Conley cousins to his mother's house. He stayed there about 30 minutes, then returned to the scene to see what was going on. Ross learned later that an old man at the convenience store had been killed.

Ross attended a meeting the day after the murder with Hannah, Jamel and Corey. Jamel told Hannah that he did not take money from the store but did leave with some chips and soda. Ross concluded his statement by saying that he had been treated well and had not been threatened or promised anything in return for his statement.

Delores Ross, defendant's mother, testified that her son was taken in for questioning about the murder on January 18, 1996. He was allowed to go home the same day. Ross was detained again on January 3, 1998. Delores said she called the police station four times and spoke to Cassidy. She said Cassidy told her Ross would be home in a few hours. Delores said she last spoke to Cassidy at 8 p.m. Ross called his mother at 9 p.m. to tell her that he had been charged with the January 18, 1996, murder.

Ross then testified on his own behalf. He denied involvement in the murder and robbery. He also denied planning a robbery. Ross admitted that he spoke to police on the day of the murder. He spoke to police again in January 1998, when Officer Parks detained him for questioning. Ross said that Officer Parks did not tell him he was under arrest. Ross met with Cassidy, who told Ross the details of the case and promised Ross he would be released if he made a statement. Ross said that he then gave a statement that included the details Cassidy

had just discussed. Ross denied being a lookout during the robbery. He included this fact in his statement because he was scared and wanted to go home.

Ross testified that Assistant State's Attorney Lanahan also said he could go home if he gave a statement. Ross testified that he said what he had to say to be released. He wanted to go and was willing to lie to be released.

Officer Parks testified in rebuttal that he never told Ross' mother that he was arresting her son. He told Ross that he was being "taken in" for murder, but that no charges would be made until they were approved by the State's Attorney.

Detective Cassidy denied speaking with defendant's mother. He also denied telling Ross what details to include in his statement.

ASA Lanahan denied telling Ross he could go home if he gave a statement.

The Ross jury found defendant guilty of first degree murder and armed robbery.

Ross and Hannah each raise two issues relating to claimed errors in their separate trials. They jointly raise one issue relating to evidence heard by both juries. We address the individual issues first.

Ross argues that the (1) State's use of peremptory challenges amounted to a *Batson* violation; and (2) evidence was insufficient to support a conviction beyond a reasonable doubt.

Ross, a male African-American, first claims that the State used four peremptory challenges to purposefully exclude African-Americans from the jury. Only two African-Americans served on the Ross jury. Ross claims that the State's use of peremptory challenges excluded twice as many African-Americans as any other race from the jury. The State responds that Ross' *Batson* motion was untimely, made after jury selection was completed and the challenged jurors dismissed. The State alternatively argues that the *Batson* claim fails due to an incomplete and confusing record. We agree with the State's alternative argument.

■ The State claims that defendant's objection was untimely because it was made after the challenged jurors had been dismissed. The State explains that once the jurors were dismissed it became impossible to remedy a successful *Batson* challenge by seating the dismissed jurors. We note that the State's argument is based on out-of-state and federal law. See *United States v. Maseratti*, 1 F.3d 330, 335 (5th Cir. 1993); *United States v. Parham*, 16 F.3d 844 (8th Cir. 1994); *Owens-Corning Fiberglas Corp. v. Henkel*, 689 A.2d 1224 (D.C. 1997); *State v. Parker*, 836 S.W.2d 930 (Mo. 1992). Our supreme court has held that a challenge to jury composition must occur before the jury is

sworn. *People v. Heard*, 187 Ill. 2d 36, 52, 718 N.E.2d 58 (1999). A defendant who fails to raise a *Batson* objection before the jury is sworn waives the issue. *People v. Richardson*, 189 Ill. 2d 401, 409, 727 N.E.2d 362 (2000). The *Batson* challenge here was timely.

Although Ross complains of the State's exclusion of four jurors, his argument on appeal only relates to three. We consider the objection to the fourth juror waived. *People v. Nieves*, 193 Ill. 2d 513, 529, 739 N.E.2d 1277 (2000).

■ *Batson* requires a *prima facie* showing that the use of peremptory challenges was racially motivated. The burden then shifts to the State to articulate a race-neutral explanation for excluding a juror. The trial court must then determine whether the defendant proved purposeful discrimination. *Batson*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. Where, as happened here, the trial court passes over the first step and asks the State for its race-neutral reasons, the issue of a *prima facie* showing becomes moot. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866 (1991). The trial court's finding on this issue is one of fact and turns on questions of credibility. We will not reverse absent clear error. *People v. Munson*, 171 Ill. 2d 158, 175, 662 N.E.2d 1265 (1996).

The thrust of Ross' *Batson* argument is that none of the reasons articulated by the State are factually supported by the record. He concludes that the factual inaccuracies establish the requisite purposeful discrimination. The State concedes the factual inaccuracies but claims that Ross still failed to meet his burden under *Batson*. We agree.

Ross' argument misconstrues the focus of a *Batson* analysis. The circumstances giving rise to the *Batson* hearing in this case are relevant to fully appreciate defendant Ross' misapprehension.

Ross raised a *Batson* objection the day after jury selection was completed. Jury selection in this case involved two juries. More than 70 prospective jurors were questioned. Thirty-four people were questioned for service on the Ross jury. Eight were African-Americans. Only two were accepted on the panel.

The day trial was scheduled to begin, the court conferred with both defense attorneys in chambers about a reluctant juror on the Hannah jury. The juror asked to be dismissed because of anxiety. The parties agreed to release the juror, replace the juror with an alternate, but not select a new alternate. Defendant Ross then raised the *Batson* issue "since we're back here on the case." The trial court questioned the timeliness of the motion. Ross' attorney admitted the motion "should have been brought yesterday."

The trial court noted that the challenged jurors had already been

dismissed and the jury cards were no longer available for a *Batson* hearing. The trial court asked the State if it had notes from the jury selection the day before. The State had notes. The court ordered the State to review these notes to articulate race-neutral reasons for excluding the challenged jurors. Ross did not challenge the factual accuracy of the State's reasons. The trial court then found that the stated reasons were race neutral.

The State said it excluded two jurors who were victims of unsolved crimes. The State reasoned that their experiences might prejudice them against the State. The State also said that one of the crime victim jurors lived near the crime scene. A third juror was excluded because the State believed she was not attentive to the process. A review of the *voir dire* record available on appeal shows that the State's reasons do not accurately reflect the *voir dire* proceedings. The State's reasons are not contradicted by the transcript, but the transcript is unclear. There is also confusion about the identity of one of the challenged jurors. The State concedes this much. But this concession does not support a purposeful discrimination finding under *Batson*.

■ *Batson* requires a defendant to prove purposeful discrimination. *Batson*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. Ross' argument assumes that, since the State's reasons are factually inaccurate because they do not mirror the record, he met his burden. But Ross overlooks that the trial court addresses the *facial* validity of the State's explanation. *Munson*, 171 Ill. 2d at 174. A race-neutral explanation is based on something other than the race of the juror. *Munson*, 171 Ill. 2d at 174. The reason offered will be deemed race neutral absent an inherent discriminatory intent. *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.

■ Here, the State explained that, because two jurors were victims of unsolved crimes, they could be prejudiced against the State. The State was concerned with another juror's lack of attention to the process. The State's reasons were race neutral. We agree with the State that the inconsistencies and confusion in the record are the result of defendant's delay in raising the *Batson* issue the day after jury selection, when the jury cards were no longer available. We also note that the cards are not part of the record on appeal. Without the cards, we are unable to test Ross' appellate arguments.

Defendant Ross did not complain of the accuracy of the State's recollection of the facts during the *Batson* hearing. He instead uses the faulty recollection to support his contention of error on appeal. Defendant Ross' strategy overlooks that it is his responsibility to preserve the record on appeal. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-

92, 459 N.E.2d 958 (1983). All ambiguities caused by an incomplete record will be resolved against him. *Foutch*, 99 Ill. 2d at 392. The trial court's finding that the State's reasons were race neutral was not clearly erroneous under these facts.

■ Ross next complains that the evidence against him was insufficient to prove him guilty of first degree murder and armed robbery beyond a reasonable doubt. Where a defendant challenges the sufficiency of the evidence against him, the inquiry is whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Kitchen*, 159 Ill. 2d 1, 25, 636 N.E.2d 433 (1994).

■ Ross' argument that his court-reported statement alone is not enough to connect him to the robbery and murder with which he is charged invokes the *corpus delicti* rule. *Corpus delicti* requires proof of injury or loss caused by criminal conduct. *People v. Furby*, 138 Ill. 2d 434, 446, 563 N.E.2d 142 (1990).

Ross sets out the inconsistences and discrepancies in all the testimony presented to the Ross jury. He explains the admissions in his court-reported statement as a product of police coercion. Ross also points out that no physical evidence was recovered. He concludes that the lack of corroboration creates a reasonable doubt as to his guilt. We disagree.

■ Ross' failure to cite a case for the proposition that a court-reported statement alone is insufficient to support a conviction is telling. A defendant's identity as the offender need not be corroborated by evidence apart from his own statements. *People v. Strickland*, 154 Ill. 2d 489, 522-23, 609 N.E.2d 1366 (1992). The confession need only be corroborated by some independent evidence showing that a crime was committed. *People v. Lambert*, 104 Ill. 2d 375, 472 N.E.2d 427 (1984). The other evidence need only tend to confirm a defendant's confession and not rise to the level of proof beyond a reasonable doubt. *People v. Cloutier*, 156 Ill. 2d 483, 503, 622 N.E.2d 774 (1993). Not every detail need correspond. *Cloutier*, 156 Ill. 2d at 503.

Ross' statement here referred to a planned robbery of the convenience store at 74th and Bishop, the murder of an old man, two teenagers running away with chips and soda, use of a .357-caliber revolver and three or four shots being fired. These facts were corroborated by other evidence establishing that the victim, an elderly man, was shot three times in the convenience store at 74th and Bishop. A witness testified he saw two teenagers running away from the scene with a bag of chips. Stipulated evidence revealed that three bullets recovered from the body and one from the scene were fired from a .357-caliber revolver. Ross' conviction here was supported by his statement, which

in turn was corroborated by independent evidence that tended to show that a crime had been committed.

To the extent that Ross relies on inconsistencies and conflicting evidence to create reasonable doubt, he overlooks that the trier of fact is charged with resolving conflicts and choosing whom to believe. *People v. Williams*, 193 Ill. 2d 306, 338, 739 N.E.2d 455 (2000). That determination is not for us to revisit. *People v. Hall*, 194 Ill. 2d 305, 330, 743 N.E.2d 521 (2000). We will not reverse a conviction absent proof so improbable or unsatisfactory that a reasonable doubt exists about a defendant's guilt. *People v. Taylor*, 186 Ill. 2d 439, 445, 712 N.E.2d 326 (1999).

We turn to Hannah. He claims the trial court erred in: (1) admitting the letters he sent to Teasha and Haikeem Hoskins; and (2) denying his proffered withdrawal instruction.

■ Hannah's argument on appeal contests admission of both letters, the one to Teasha and the one to Haikeem. But the record shows that Hannah objected only to the introduction of Haikeem's letter. Hannah's failure to object at trial to Teasha's testimony about her letter and raise the issue again in a posttrial motion waives the issue on appeal. See *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988).

Hannah contends that the letter he wrote to Haikeem should not have been admitted as an admission against interest. He also claims that the letter improperly introduced other crimes evidence.

We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Cruz*, 162 Ill. 2d 314, 331, 643 N.E.2d 636, 644 (1994).

■ Hannah first argues that, since the letter is not an admission of guilt, it does not qualify as an admission against interest. This argument is unpersuasive. The letter contained threats against Haikeem, a State witness. It was properly admitted as evidence of consciousness of guilt. *People v. Lucas*, 151 Ill. 2d 461, 486, 603 N.E.2d 460 (1992). Defendant's reliance on *People v. Manning*, 182 Ill. 2d 193, 695 N.E.2d 423 (1998), is misplaced. The defendant in *Manning* did not threaten a State witness. The evidence in that case instead showed a propensity to commit crime. *Manning*, 182 Ill. 2d at 212-15. The letter also did not improperly introduce evidence of other crimes as defendant Hannah claims.

Evidence of other crimes is not admissible to establish a defendant's propensity to commit crimes. *People v. Nieves*, 193 Ill. 2d 513, 529, 739 N.E.2d 1277 (2000). But such evidence may be proper to establish the investigatory process. *Nieves*, 193 Ill. 2d at 530. Evidence that suggests a defendant's participation in earlier crimes should not be admitted unless relevant. *Nieves*, 193 Ill. 2d at 529. The letter here referenced an unrelated cab driver murder, in which Hannah denied

involvement. Hannah summarily concludes that this reference is irrelevant and prejudicial. We disagree.

Haikeem testified he gave police information about the January 18, 1996, murder during an interview with police on November 26, 1997. The reference to the cab driver murder explains which interview Hannah was alluding to when he told Haikeem he found out "all that *** [Haikeem] told them people on November 26." The reference also set out the investigatory process that ultimately led to Hannah's arrest for the January 18, 1996, murder and shows that Hannah's threats relate to testimony Haikeem will give relating to that murder.

The bar on other crimes evidence shields a jury from matters that might lead jurors to conclude that the defendant is a bad person who should be punished. *Hall*, 194 Ill. 2d at 339. "Although the erroneous admission of other-crimes evidence ordinarily calls for reversal, the evidence must have been a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different. If it is unlikely that the error influenced the jury, reversal is not warranted." *Hall*, 194 Ill. 2d at 339, citing *People v. Cortes*, 181 Ill. 2d 249, 285 (1998). Nothing in the record suggests that Hannah was convicted based on anything other than the evidence against him establishing his participation in and planning of the January 18, 1996, robbery and subsequent murder. The trial court did not abuse its discretion in admitting the letter.

Hannah next contends that the trial court erred in refusing to give the IPI instruction on withdrawal. IPI Criminal 3d No. 5.04. Instruction of a jury is left to the discretion of the trial court. *People v. Castillo*, 188 Ill. 2d 536, 540, 723 N.E.2d 274 (1999). A defendant has the right to have the jury instructed on a defense supported by the evidence. *People v. Janik*, 127 Ill. 2d 390, 537 N.E.2d 756 (1989). A trial court abuses its discretion when it fails to give an instruction that is supported by the evidence. *People v. DiVincenzo*, 183 Ill. 2d 239, 249, 700 N.E.2d 981 (1998).

Hannah contends that whether his failure to meet the others as planned amounted to a withdrawal from the criminal act is a question of fact for the jury. He claims that his failure to participate could be taken as a communication of his intent to withdraw. We disagree under the facts of this case.

A person is legally accountable for the conduct of another when he solicits, aids, abets, agrees or attempts to aid another in the commission of a crime. *People v. Ruiz*, 94 Ill. 2d 245, 255, 447 N.E.2d 148 (1982). Legal accountability ends when a defendant detaches himself from the criminal enterprise by wholly depriving the enterprise of the effectiveness of his efforts, gives timely warning to

law enforcement authorities, or otherwise makes an effort to prevent commission of the crime. *People v. Rybka*, 16 Ill. 2d 394, 405, 158 N.E.2d 17 (1959). It is the communication of intent, not the naked fact of withdrawal, that determines whether a defendant is released from accountability liability. *Rybka*, 16 Ill. 2d at 406. There is no evidence in this record that Hannah warned law enforcement of the impending crime. So, his right to the instruction must be based on one of two theories: that his absence from the scene on the day of the crime wholly deprived the enterprise of his efforts, or that he otherwise made an effort to prevent the crime. The best evidence that he did not wholly deprive the enterprise of his efforts is that the crime he planned took place. He is left with the argument that by not showing up at the scene he "made an effort" to prevent the crime. It is an argument that suggests he withdrew his intent to be the principal actor in the robbery when he did not show up at the scene. But as *Rybka* holds, it is the "communication" of intent, not the naked act of withdrawal, that determines whether a defendant is released from accountability. *Rybka*, 16 Ill. 2d at 406. So, Hannah is left, finally, with the argument that failing to join the others can be interpreted as a "communication" to his partners that he intended to withdraw from the enterprise. The record on which the trial court relied to deny the instruction strongly suggests otherwise.

■ Hannah's court-reported statement shows that Hannah, a gang coordinator in charge of juvenile members, held two meetings to plan a convenience store robbery. Hannah decided at a January 17 meeting that the robbery would happen the next day. He then reviewed and repeated his instructions to the younger gang members under his supervision and revealed the location of the gun to be used in the crime. Hannah's attendance at school prevented him from being present during the robbery. But, in an effort to share in the proceeds, Hannah asked one of the others if he had taken money from the store. See *People v. Quiroz*, 229 Ill. App. 3d 241, 593 N.E.2d 675 (1992) (evidence of postcrime behavior of defendant is competent to show participation in the crime itself).

Hannah's argument that absence at a crime otherwise planned and orchestrated by him amounts to withdrawal is similar to a withdrawal argument we rejected in *Quiroz*, 229 Ill. App. 3d at 245-46.

Much like the evidence here, which relies only on Hannah's absence to support a withdrawal theory, in *Quiroz* we noted:

> "Here the only possible evidence of withdrawal was [the defendant's] statement that he motioned to Anaya that the men they were looking for were no longer in the area. This, however, does not seem to be a manifestation of [the defendant's] intent to

withdraw. Instead, it merely indicated [the defendant's] belief that their efforts had been thwarted \*\*\*. Nothing in the record supports the notion that [the defendant] ever expressed, in any manner, a desire to terminate his efforts to assist Anaya." *Quiroz*, 229 Ill. App. 3d at 245-46.

The trial court's refusal to give the withdrawal instruction here was not error.

The thoughtful dissent in this case points out that we have relied in part on cases where the withdrawal instruction was, in fact, given. This is true. But we have used those cases because they accurately set out the principles that underlie the law of withdrawal. We do not intend to suggest that the procedural facts of the cases are similar to those before us. What we do suggest is that there is no evidence in this record of an essential component of withdrawal: wholly depriving one's earlier efforts of effectiveness.

Both defendants next argue that Officer Starks should not have been allowed to testify as an expert on gang infrastructure. Defendants contend that Officer Starks was not qualified to testify as an expert where he was not known as a "gang specialist," he demonstrated no actual expertise, and his testimony consisted of repeated hearsay. We review this issue for an abuse of discretion. *People v. Miller*, 173 Ill. 2d 167, 186, 670 N.E.2d 721 (1996).

█ Expert testimony relating to gang activity is admissible where relevant to a disputed issue, its probative value is not outweighed by its prejudicial effect and the police officer's testimony qualifies as an expert opinion. *People v. Langford*, 234 Ill. App. 3d 855, 858, 602 N.E.2d 9 (1992). A person may testify as an expert if his experience and qualifications afford him knowledge not common to a layperson and the testimony will aid the trier of fact. *Miller*, 173 Ill. 2d at 186. There is no predetermined formula for how an expert gains his knowledge. Knowledge can be gained from study, training or practical experience. *Miller*, 173 Ill. 2d at 186.

█ Here, Starks testified that he had worked in a gang tactical unit for four years. He said that his assignment exposed him to Gangster Disciple activity and that he had regular contact with members of that gang. Starks said that he had attended many seminars on gangs and gang crimes in Chicago. Starks said that he was assigned to the area where the murder happened, which was controlled by Gangster Disciples.

Defendants claim that this evidence shows only that "Officer Starks was just a street or patrol officer who talked to gang members." Defendants claim that Starks' purported expert testimony was nothing more than "the repetition of hearsay, [designed] to add substance to the State's case-in-chief." Defendants' argument is unpersuasive.

Starks' testimony showed that his gang knowledge exceeded that of the average citizen, which is all the knowledge an expert need have. *People v. Novak*, 163 Ill. 2d 93, 104 (1994). It does not matter that Starks gained this knowledge from talking to gang members for the past four years. *Miller*, 173 Ill. 2d at 186. So long as the evidence would be reasonably relied on by experts in the field, the evidence is admissible. *Wilson v. Clark*, 84 Ill. 2d 186, 193, 417 N.E.2d 1322 (1981).

The record also shows that defendants agreed that gang evidence was relevant to disputed issues. Gang chain of command was referred to in both defendants' court-reported statements later published to each jury. Where, as here, defendants were being tried under an accountability theory, gang hierarchy evidence became relevant to establish a motive and common design or plan. *People v. Gonzalez*, 142 Ill. 2d 481, 489, 568 N.E.2d 864 (1991). The probative value of the evidence outweighed possible prejudice. To the extent that defendants' argument can be read as relating, not to the admissibility of Starks' testimony, but to the weight that testimony should receive, that determination is left to the trier of fact. *Williams*, 193 Ill. 2d at 338.

■ The last two issues raised by defendants relate to sentencing. Defendants argue that: (1) the trial court erred by ordering consecutive sentences; and (2) that both sentences violate the rule set out in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). The State concedes that, because the felony murder convictions here were predicated on the armed robbery, the armed robbery convictions and sentences must be vacated under *People v. Smith*, 183 Ill. 2d 425, 430-32, 701 N.E.2d 1097 (1998). This concession renders the *Apprendi* issue moot.

The judgment of the trial court is affirmed. Defendants' convictions and sentences for armed robbery are vacated.

Affirmed in part and vacated in part.

GORDON, J., concurs.

JUSTICE McBRIDE, specially concurring in part and dissenting in part:

I respectfully dissent from the majority's decision to affirm the convictions of Demel Hannah. I would remand the matter for a new trial based upon the failure to give the withdrawal instruction requested by defendant. I concur with the majority's decision regarding all other issues raised by Hannah and I concur in all respects with the decision to affirm the convictions of Mario Ross.

My reasons for the dissent are as follows. A defendant is entitled

to have the jury instructed on any legally recognized defense which is supported by some evidence, including slight evidence. *People v. Jones*, 175 Ill. 2d 126, 132, 676 N.E.2d 646 (1997).

In deciding whether to instruct on a defense theory, the court's role is to determine whether there is some evidence supporting that theory; it is not the court's role to weigh the evidence. *Jones*, 175 Ill. 2d at 132.

Generally, a defendant is required to produce some evidence at trial regarding an affirmative defense but will be excused from presenting that evidence where the State's evidence raises the issue of an affirmative defense. *Jones*, 175 Ill. 2d at 132. Moreover, a defendant is not required to testify or offer any evidence where there is circumstantial evidence presented to raise a defense. *Jones*, 175 Ill. 2d at 133.

Unless the evidence before the trial court is so clear and convincing as to permit the court to find as a matter of law that there is no affirmative defense, the issue of whether a defendant should be relieved of criminal responsibility by reason of his defense must be determined by the jury with proper instruction as to the applicable law. *Jones*, 175 Ill. 2d at 132.

Finally, where there is some foundation for the instruction because there is some slight evidence shown in the record, it is an abuse of discretion for the trial court to refuse to so instruct the jury. *Jones*, 175 Ill. 2d at 132.

As the majority points out, "[i]t is the communication of intent, not the naked fact of withdrawal, that determines whether a defendant is released from accountability liability." 329 Ill. App. 3d at 886. The withdrawal must also be timely so as to give the coconspirators a reasonable opportunity to follow the example and to refrain from further action before the act is committed. The trier of fact must be able to find that the accused wholly and effectively detached himself from the criminal enterprise before the crime is in the process of consummation or has become so inevitable that it cannot reasonably be stayed. *Quiroz*, 229 Ill. App. 3d at 245; 720 ILCS 5/5—2(c)(3) (West 1998).

Although the evidence presented at trial showed that defendant initiated a plan to rob the Nic and Pic store, it also disclosed that defendant was not present at any time during the commission of the robbery and shooting that took place on January 18, 1996. This is not to suggest that a defendant can be absolved from accountability liability simply because he is absent from the scene. Presence at the scene of the crime is not a required element of accomplice liability. *People v. Nino*, 279 Ill. App. 3d 1027, 665 N.E.2d 847 (1996). A person absent from the scene of the crime can be charged as an accomplice if he or she participated in the plan. *Nino*, 279 Ill. App. 3d at 1032.

Nonetheless, in this particular case under these particular facts, if defendant's complete absence from the scene can be said to amount to some evidence of a communication of a withdrawal, then the instruction should have been given. It can also be said that if the defendant's absence from the scene was some evidence of a communication of a withdrawal, it was timely because the defendant was not present immediately before the commission of these offenses began.

The defendant's statement indicated that the planning of the robbery took place at meetings held in December 1995 and on January 17, 1996. According to defendant's statement, the robbery was to occur on January 18, 1996, but only defendant was to go inside the store and his codefendant and accomplices were to act as lookouts outside the store at particular locations on the streets nearby. Even though Hannah did not appear at the store at any time on January 18, 1996, his codefendant and two accomplices carried out an armed robbery and murder without his presence or assistance during the actual commission of the offenses. Considering the elaborate plan that had been conceived by this 16-year-old "coordinator" and the fact that defendant did not show up at all to carry out the plan, this evidence, in my opinion, could be circumstantially viewed as some evidence that defendant was communicating to his other youthful cohorts that he was withdrawing from the planned robbery.

In his statement, defendant also indicated that he did not show up on the day of the robbery because his mother made him go to school. Primarily because of this portion of defendant's statement, the trial court found that there was no evidence from which the jury could conclude the defendant was withdrawing from the offenses. In my opinion, by focusing solely upon this portion of the defendant's statement, the trial court was not determining whether there was some evidence of the withdrawal defense but was weighing the evidence.

Because there was other evidence in that same statement that suggested defendant had a "change of plan," that he was shocked to hear what happened and because the jury is free to accept or reject any portion of the evidence received at trial, I believe defendant was entitled to the instruction on his theory of the defense, even though the evidence might be viewed as slight.

Hannah elected not to testify at trial but called one of his high school teachers, who testified that defendant was in school at the time of the robbery and shooting. Although Hannah told the assistant State's Attorney that his mother made him go to school on January 18, 1996, there is no evidence that this fact was somehow relayed to his accomplices. This conduct, that is, Hannah's failure to appear and participate at the time of the commission of the offenses, could have

conveyed his intent to withdraw to the accomplices. Defendant argued that this fact and the other evidence presented were sufficient to warrant the withdrawal instruction.

I agree with the defendant and believe that there was some evidence of a communication of the intent to withdraw. First, there was the State's evidence which established defendant was not present at any time during the actual commission of these offenses. Second, there was testimony presented that on January 18, 1996, defendant was at school, and after school he went to the YMCA. This testimony, which established his complete absence from the scene before, during and immediately after the commission of these offenses, amounted to the presentation of some circumstantial evidence of a communication of defendant's intent to withdraw to the other offenders.

As pointed out in *Jones*, the defendant is not required to testify to warrant an instruction on a defense. Nor do I believe that the giving of the withdrawal instruction requires evidence of a verbal communication to the codefendant or an accomplice. I believe all that is required is a showing of some evidence of a communication of an intent to withdraw. Further, the question of whether the defendant is entitled to an instruction should be determined by looking at the whole of the evidence, and this is true even when the instruction is based upon facts which are inconsistent with the defendant's own testimony. *People v. Jefferson*, 257 Ill. App. 3d 258, 265, 628 N.E.2d 925 (1993).

The cases cited by the majority and those decisions relied upon by the trial court did not involve the refusal of the trial court to give a withdrawal instruction. In fact, in *Quiroz* a withdrawal instruction was given. *Quiroz*, 229 Ill. App. 3d at 243. *Rybka* did not consider the issue of a trial court's refusal to give a withdrawal instruction, but involved the sufficiency of the evidence. *Rybka*, 16 Ill. 2d at 406-07. Both cases involved situations where the defendants were present at or near the crimes at the time that they were committed. These decisions don't answer the withdrawal instruction issue before this court.

Although defendant was deeply involved in the planning of the offense, to the extent that he was to retrieve the gun to be used and only he was to enter the store, the evidence still shows that he was detached from the offenses for which he was on trial, at the time the commission of those offenses began.

Because this was an accountability case and the State was required to show "(1) the defendant solicited, ordered, abetted, agreed, or attempted to aid *** in the planning or commission of the crime; (2) the defendant's participation took place before or during the commission of the crime; and (3) the defendant had the concurrent intent to promote or facilitate the commission of the crime" (*In re W.C.*, 167 Ill.

2d 307, 337, 657 N.E. 2d 908 (1995)), I believe the defendant was also entitled to have the jury consider the defense of withdrawal.

In my opinion, it was error to prevent defendant from presenting this defense by means of the tendered instruction. Therefore, I respectfully dissent from that portion of the opinion and would remand Hannah's case for a new trial.